## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RECEIVED

SEP 02 2005

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

| | | |
|---|---|---|
| GEORGE S. MAY INTERNATIONAL COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case Number 04-C-6018 |
| -vs- | ) ) | Judge Norgle |
| XCENTRIC VENTURES, LLC, RIP-OFF REPORT.COM BADBUSINESSBUREAU.COM, ED MAGEDSON, VARIOUS JOHN DOES, JANE DOES AND ABC COMPANIES, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF GEORGE S. MAY INTERNATIONAL COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANTS ED MAGEDSON AND XCENTRIC VENTURES, LLC'S MOTIONS TO DISMISS FOR LACK OF JURISDICTION**

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Summary of Argument .......................................................................................................... 4

Statement of Facts ................................................................................................................ 4

Argument .............................................................................................................................. 8

I.  Minimum Contacts Support the Assertion of Jurisdiction ........................................ 8

II.  Defendants' Websites Are Interactive and Commercial,
    and Provide Sufficient Minimum Contacts to Subject
    Defendants to the Jurisdiction of This Court ......................................................... 10

III.  Defendants' Contacts with the State of Illinois Are
     Continuous and Systematic, Subjecting Them to the
     General Jurisdiction of This Court ........................................................................ 14

IV.  Defendants' Contacts Are Sufficient to Establish
    Specific Jurisdiction ............................................................................................ 16

    A.  Jurisdiction is Appropriate Under the "Effects Test" ................................ 16

    B.  Defendants' Use of Metatags Constitutes Sufficient
        Minimum Contacts With Illinois ............................................................. 19

V.  This Court's Exercise of Jurisdiction Over Defendants
    Is Reasonable ...................................................................................................... 20

VI.  Plaintiff Has No Contractual Agreement with Defendants
    Requiring Suit in Arizona .................................................................................... 22

CONCLUSION .................................................................................................................. 25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **GEORGE S. MAY INTERNATIONAL COMPANY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case Number 04-C-6018 |
| -vs- | ) |
| | ) Judge Norgle |
| **XCENTRIC VENTURES, LLC, RIP-OFF REPORT.COM BADBUSINESSBUREAU.COM, ED MAGEDSON, VARIOUS JOHN DOES, JANE DOES AND ABC COMPANIES,** | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF GEORGE S. MAY INTERNATIONAL COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANTS ED MAGEDSON AND XCENTRIC VENTURES, LLC'S MOTIONS TO DISMISS FOR LACK OF JURISDICTION**

**INTRODUCTION**

On September 24, 2004, this Court granted George S. May International Company

("GSMIC") a temporary restraining order which required Defendants to remove postings from

their Internet websites located at www.badbusinessbureau.com and www.ripoffreport.com.   The

postings contained false and misleading information about GSMIC and its business.   While

Defendants took down one particularly egregious posting stating that GSMIC has engaged in

acts of child pornography and drug dealing, Defendants have left standing numerous postings

which state that GSMIC,  its management, and employees have engaged in, among other things,

larceny, deceptive trade practices, and scams.   Further, Defendants have refused to take down

false postings, including a posting which was falsely ascribed to GSMIC's President, and

postings that even the original posters have asked Defendants to take down as false.   This is the

subject of GSMIC's  pending motion for contempt against Defendants.

While Defendants are based in Arizona, the web sites they operate are <u>interactive</u>. Defendants and their sites solicit and receive funds from Illinois residents as part of the operation of the web sites. According to the discovery received from Defendants, their websites have received at least 11 payments from Illinois residents (at least one of whom is the President of a competitor of GSMIC) in the last 18 months and sold at least 12 copies of Defendant Ed Magedson's book to Illinois residents in 2005. *App.* at Exh. 2, pages 6-8. Records from PayPal, the service used by Defendants' to process donations and sales of the "Rip-off Revenge Guide" sold on the websites, indicates that Defendants received 47 donations or payments from Illinois residents from December of 2003 through May of 2005. *App.* at Exh. 6. Moreover, Defendants have actively communicated/negotiated with at least three plaintiffs' class action law firms in the Chicago area. In August 2004, Defendants offered to the Blim & Edelson law firm in Chicago, the opportunity (for a payment of $800,000/year) to serve as a referral source for class action law suits. *App.* at Exh. 3, page 2. In February and May 2005, Defendants referred consumers to the Lakin Law Firm of Wood River, Illinois. *App.* at Exh. 3, page 53-54, 85-86. In June 2005, the Segal Law Offices of Rockford, Illinois sought assistance from Defendants in funneling class action plaintiffs to the firm. *App.* at Exh. 3, page 96.

Finally, Defendants have targeted their efforts specifically at soliciting false factual statements about GSMIC. Defendants' activities related to GSMIC have profited Defendants and harmed GSMIC. The false postings posted and/or hosted by Defendants have caused GSMIC to lose existing and potential customers and employees. See correspondence, attached as Exhibit 1 to this brief.

On December 3, 2004, this Court granted GSMIC's motion to take discovery from the Defendants on the jurisdictional issues raised by Defendants. Defendants raised the defense of lack of personal jurisdiction in both their responses to GSMIC's Motion for a Preliminary

2

Injunction, and in their subsequently filed Motions to Dismiss. Despite numerous efforts to obtain discovery, GSMIC ultimately filed a Motion to Compel. In the interim, XCentric Ventures, LLC ("XCentric") filed a Motion to Dismiss for Lack of Personal Jurisdiction. Briefing on XCentric's motion was stayed pending resolution of the discovery issues by order entered on March 14, 2005. Ultimately, GSMIC's Motion to Compel was granted by this Court on June 9, 2005. Defendants were given until July 7, 2005 to comply with the Court's order, but failed to comply, necessitating a Motion to Enforce the Court's June 9, 2005 Granting Plaintiff's Motion to Compel and Motion for Sanctions Under FRCP 37(b), which is currently being briefed by the parties for this Court.

In the interim, Defendant Ed Magedson filed his Motion to Dismiss for Lack of Jurisdiction on August 5, 2005. Ed Magedson's motion raised the same issues which prompted GSMIC to seek discovery from Defendants in the first place. While the Court ordered briefing on Ed Magedson's motion, the Court has not ordered briefing on XCentric's Motion to Dismiss. In the interests of seeking a resolution of the jurisdictional issues which are relevant to GSMIC's Motion for a Preliminary Injunction, GSMIC has elected to respond to both XCentric's and Ed Magedson's Motion to Dismiss. GSMIC's instant response utilizes the discovery it has received to date. As discussed below, GSMIC strongly believes that the facts unearthed through discovery are sufficient for this Court to deny Defendants' Motions to Dismiss and proceed to the substantive issues involved in GSMIC's Motion for a Preliminary Injunction and Motion for Contempt, both of which are fully briefed. To the extent that this Court believes that the information GSMIC presents with this Motion may be insufficient to deny Defendants' motions, GSMIC respectfully asks the Court to defer ruling on XCentric's and Ed Magedson's Motions to Dismiss until it rules on GSMIC's Motion to Enforce the Court's June 9, 2005 Order Granting Plaintiff's Motion to Compel and Motion for Sanctions Under FRCP 37(b).

3

## SUMMARY OF ARGUMENT

There is personal jurisdiction over the Defendants in this case. Among other things, Defendants operate for-profit interactive web sites that solicit and receive on-line payments from consumers in Illinois, have established and sought to establish business relationships with law firms in Illinois to receive money in exchange for referrals, encourage the posting of and host content from individuals in Illinois, and engage in active e-mail and telephone communication with individuals in Illinois. Defendants profit directly from their web-related activity in Illinois. In addition, Defendants' tortious conduct is directed specifically towards GSMIC, which is a business based in Illinois. As such, it is fair, just and reasonable to require Defendants to defend this action in Illinois.

## STATEMENT OF FACTS

Contrary to the very brief discussion of the facts in Defendants' motions, the material available on Defendants' websites (www.ripoffreport.com and www.badbusinessbureau.com) and the discovery received to date reveal substantial contacts with the State of Illinois and supports this Court's exercise of jurisdiction over Defendants. In the paragraph of their briefs entitled "Relevant Facts," Defendants have elected to provide cursory statements, such as the statement in Ed Magedson's brief that "[h]e does not do business with or within the State of Illinois." Magedson Brief at 2. Discovery shows that these conclusory statements are false.

Ed Magedson is the manager of Xcentric, and the creator and self-proclaimed "EDitor" of the websites operated by XCentric, www.ripoffreport.com and www.badbusinessbureau.com. *App.* at Exh. 2, pages 104-109. XCentric is registered with the State of Arizona as a for profit limited liability corporation. *Id.* Xcentric's managers and members include Ed Magedson and Creative Business Investment, a Nevada corporation. *Id.* XCentric has nine employees, not including Ed Magedson. *See* Defendants' Response to George S. May International Company's

4

Motion to Enforce Court's June 9, 2005 Order Granting Plaintiff's Motion to Compel and Motion for Sanctions Under FRCP 37(b), at 4 and Exh. B. Defendants have a marketing agreement with an individual, "Ed Nusbaum," who is authorized to procure advertisements from programs such as Google's Adsense on Defendants' behalf. *App.* at Exh. Exh. 5. There is no geographic restriction on Mr. Nusbaum's agency, and Defendants' websites are filled with advertisements for companies such as eBay and Napster. *App.* at Exh. 4 at ¶ 8 and Exh. 5. At least as of the time XCentric filed its Motion to Dismiss, Sterling Network Services was the host of the websites, and Sterling Network Services states that it has a location in Northbrook, Illinois. *App.* at Exh. 4 at ¶10.

Defendants' websites perform several functions which make the web sites interactive in nature. One the functions of Defendants' websites is to encourage and allow individuals to post reports, rebuttals, and updates to complain about everything from businesses such as GSMIC, to "dead beat Dads & Moms," to "corrupt government employees & politicians." When individuals seek to post a report, rebuttal, or update on Defendants' websites, they are required to register with the websites and provide identifying information such as a name, email address, and address. *App.* at Exh. 4 at ¶11. According to Defendants, their employees "review reports as they come in and redact curses, threat and personal information, such as credit card numbers." *See* Defendants' Response to George S. May International Company's Motion to Enforce Court's June 9, 2005 Order Granting Plaintiff's Motion to Compel and Motion for Sanctions Under FRCP 37(b), at 4. In addition, Ed Magedson reviews and edits postings, personally communicates with posters and posts responses to the various reports, rebuttals, and updates. *App.* at Exh. 3 and Exh. 4 at ¶ 9.

Based on reports, rebuttals, and updates dated from approximately March 30, 2002 to September 1, 2005, Mr. Magedson has posted on the XCentric websites approximately eighty-

five (85) written responses to individuals either complaining about companies located in the State of Illinois, or in response to individuals who have identified themselves as residing in the State of Illinois. *App.* at Exh. 4.

As an incentive for individuals to file reports, Defendants inform individuals that reports they file "will be discovered by millions of consumers!" and that "[s]earch engines will automatically discover most Reports." *App.* at Exh. 4 at ¶6 (exhibit C to the Declaration) . Thus, Defendants foresee that their sites will have impact in Illinois.   It is clear that, in an effort to further discovery of the websites, Defendants place "metatags" in the language of their webpages.  For example, Defendants place the words "George S May" in the webpages' properties so that a search for "George S May" in an Internet search engine such as Google will uncover results for complaints against the company posted on www.ripoffreport.com. *App.* at Exh. 4 at ¶ 12.

Additionally, Defendants promote the fact that they connect individuals with attorneys to file class-action lawsuits against the companies.  Indeed, the discovery produced by Defendants indicates that Ed Magedson has referred individuals to The Lakin Law Firm of Wood River, Illinois. *App.* at Exh. 3, page 53-54, 85-86.  Moreover, Ed Magedson has also sought to enter into a commercial referral relationship with Blim and Edelson, LLC, a law firm located in Chicago. *App.* at Exh. 3, page 2.  Based on their email correspondence, Ed Magedson originally quoted Jay Edelson of Blim and Edelson, LLC, a figure of $800,000 as a fee for Defendants to refer individuals interested in filing a lawsuit to Blim and Edelson, LLC. *Id.*  Defendants have produced similar correspondence with Matthew Miller, of Miller & Sweeney, LLC, another Chicago-based law firm, and with Segall Law Offices of Rockford, Illinois. *App.* at Exh. 3, pages 59-61, 96.

6

Via its websites, Defendants also solicit money in the form of financial contributions and offer for sale the book "Rip-off Revenge Guide" authored by Ed Magedson, the founder of the websites. *App.* at Exh. 4 at ¶¶ 4-5 (exhibits A & B to the Declaration). While the discovery produced by Defendants only indicates 24 sales or donations from Illinois residents, the discovery received from PayPal, the service used to process donations and payments for Defendants indicates 47 sales or donations from Illinois residents from December 2003 through 2005. *App.* at Exh. 2, pages 6-8, and Exh. 6. Included among Defendants' customers is Mr. Daniel L. Hostetler, a former GSMIC executive who now owns and operates a competitive business Strategic Business Partners (SBP), with whom GSMIC is litigating. *App.* at Exh. 2, pages 6-8. Thus, GSMIC's competitor in Illinois is financing the posting of false and defamatory information about GSMIC—which is a main theory upon which this case was brought in the first place—to stop GSMIC's competitors from using Defendants' site to defame GSMIC and hurt GSMIC's business.

In addition to soliciting commercial relationships with attorneys in Illinois, and receiving payments from individuals in Illinois, in operating Defendants' business, Ed Magedson also interacts on a regular basis with many individuals based in Illinois, including regular communications by e-mail and telephone. *App.* at Exh. 3. The correspondence produced by Defendants indicates that individuals often contact Ed Magedson for advice on dealing with companies, and the Ed Magedson also solicits information from those consumers. *Id.* Ed Magedson has also had correspondence with individuals regarding GSMIC. *App.* at Exh. 3, pages 13-18, 62-63.

Defendants' stand to profit by continually soliciting postings like the false, defamatory, and harmful postings regarding GSMIC that can be found on the websites. The more negativity Defendants can muster, the more money consumers in Illinois will pay Defendants, and the more

7

class action plaintiffs Defendants can funnel to lawyers in Illinois. In addition, as noted in other cases brought against Defendants, Defendants stand to profit by soliciting payments from GSMIC to police their own sites. *See, e.g., Hy Cite Corp. v. Badbusinessbureau.com, LLC*, 297 F.Supp.2d 1154, 1156 (W.D. Wis. 2004) (noting that defendant offered plaintiff the opportunity to enroll in defendant's consumer advocacy program, to the tune of an initial fee of $30,000 and an additional $20,000 at a later date).

Based on the discovery received from Defendants, although incomplete, it is clear that the authors of several of the reports, rebuttals, and updates specifically requested by GSMIC in its discovery are located in the State of Illinois. *App.* at Exh. 2, pages 25-103. GSMIC is an Illinois-based company, and all of the reports are edited by Defendants to reflect GSMIC's address in Park Ridge in the title of the report and also reflect GSMIC's address in a heading at the beginning of the report. *Id.* Given that Defendants request specific identifying information for the individuals authoring the reports, it is disingenuous of Defendants to argue that their activities are not aimed at Illinois. Magedson's Motion to Dismiss at 8. Indeed, the correspondence between Defendants and individuals clearly indicates that they are aware that the postings have a deleterious effect on GSMIC. *See, e.g., App.* at Exh. 3, pages 62-63. The damage done to GSMIC is irreparable; from October 2004 through May 2005, GSMIC continues to receive correspondence from prospective clients or employees noting the posting on the websites and declining GSMIC's services or employment with GSMIC. *See* exhibit 1 to brief.

## ARGUMENT

### DEFENDANTS' MOTIONS TO DISMISS SHOULD BE DENIED BECAUSE THIS COURT HAS JURISDICTION OVER DEFENDANTS.

### I.   MINIMUM CONTACTS SUPPORT THE ASSERTION OF JURISDICTION.

While the plaintiff bears "'the burden of establishing a prima facie case for personal jurisdiction'" this Court construes "all disputed facts bearing on jurisdiction in the light most favorable to the [plaintiff.]" *Publications International, Ltd. v. Burke/Triolo, Inc.*, 121 F.Supp.2d 1178, 1181 (N.D. Ill. 2000). This Court may exercise personal jurisdiction if an Illinois state court would have jurisdiction. *Kavo America Corp. v. J.F. Jelenko & Co.*, No. 00-C-1355, 2000 U.S. Dist. LEXIS 7729, at *4 (N.D. Ill. June 2, 2000). Under Illinois' long-arm statute, Defendants are subject to this Court's jurisdiction from a cause of action arising from the transaction of business within Illinois of the commission of a tortious act within Illinois. 735 ILCS 5/2-209(a)(1) and (a)(2). Additionally, under the long-arm statute Defendants may be amenable to suit in Illinois simply by doing business within Illinois. 735 ILCS 5/2-209(b)(4). Moreover, the Illinois long-arm statute also contains a "catch-all" provision authorizing courts to exercise jurisdiction "on any other basis now or hereafter permitted by the Illinois constitution and the Constitution of the United States." 735 ILCS 5/2-209.

In light of this catch-all provision, courts have concluded that "'if the contacts between the defendants and Illinois are sufficient to satisfy the requirements of due process, then the requirements of both the Illinois long-arm statute and the United States Constitution have been met, and no other inquiry is necessary." *Kavo*, No.00-C-1355, at *4 (citations omitted). In order to satisfy federal due process, Defendants must have such minimum contacts with Illinois such that the exercise of jurisdiction must comport with "'traditional notions of fair play and substantial justice.'" *Id.* at *5; *Bombliss v. Cornelsen*, 824 N.E.2d 1175, 1179, *citing Hanson v. Denckla* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L. Ed. 2d 490 (1980). With respect to analyzing a defendant's minimum contacts, the Kavo court noted "'[s]pecific jurisdiction exists when the defendant has 'purposefully directed' his activities at residents of the forum'

9

state and when the claim results from injuries that 'arise our of or relate to' the defendant's

contacts with the forum state." *Id.* Moreover, "[g]eneral jurisdiction exists when the defendant

has 'continuous and systematic general business contacts' with the forum state." *Id.* In this case,

Defendants's contacts subject them to both general and specific jurisdiction.

Moreover, it is important to note that while Defendants have made much of the Western

District of Wisconsin's decision concluding that it lacked jurisdiction, at least one other court

concluded that Defendants' were in fact subject to the jurisdiction of federal court located in

Florida. *Whitney Information Network, Inc. v. XCentric Ventures, LLC et al.,* 347 F.Supp. 2d

1242 (M.D. Fla. 2004) attached as *App.* at Exh. 1. Under identical facts, the *Whitney* court noted

that "[t]he purpose of the defendants' website is to publish consumer complaints, which

defendants actively solicit, and to imply that the company named in such complaint is 'ripping

off' consumers" and, concluded that "[t]he activity takes defendants' conduct beyond a mere

passive website, and allows the Court to exercise personal jurisdiction." *Id.* at 1243 and 1245.

## II. DEFENDANTS WEBSITES ARE INTERACTIVE AND COMMERCIAL, AND PROVIDE SUFFICIENT MINIMUM CONTACTS TO SUBJECT DEFENDANTS TO THE JURISDICTION OF THIS COURT.

In analyzing whether a defendant's activities over the Internet are sufficient to confer

jurisdiction, the majority of jurisdictions and district courts within the Seventh Circuit, as well as

the *Bombliss* court  accepted the sliding-scale analysis enunciated in *Zippo Mfg. Co. v. Zippo Dot*

*Com, Inc.,* 952 F. Supp 1119, 1124 (W.D. Pa. 1997). *Bombliss,*  824 N.E.2d 1175 at 1179;

*Euromarket,* 96 F. Supp. 2d at 837; *Litmer v. PDQUSA.com,* 326 F. Supp. 2d 952, 957 (N.D.

Ind. 2004).[1]  In *Zippo,* the court developed a three-part sliding scale analysis to determine what

---

[1] Defendants rely on *Hy Cite* to support their motion, however, in that case the Western District of Wisconsin declines to adopt the Zippo analysis, which is the accepted rule in most courts, including the Northern District of Illinois. *Hy Cite,* 297 F. Supp. 2d at 1161

level of website activity sufficiently subjects a defendant to personal jurisdiction, and defined the

levels as follows:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant simply posted information on an internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

> *Zippo*, 952 F. Supp at 1124.

In this case, the interactivity and commercial nature of the website compellingly show that the

Defendants' websites fall within the latter two categories. Thus, this Court's exercise of

jurisdiction is proper.

This Court, the Illinois Appellate Court and other federal courts within the Seventh

Circuit, found websites to be interactive and commercial in circumstances comparable to the

current matter. In *Publications*, this Court considered a website interactive because it allowed

users to fill out an online form requesting a catalogue. *Publications Int'l Ltd. v. Burke/Triolo,

Inc.*, 121 F. Supp. 2d 1178 at 1182 (N.D. Ill. 2000). In a footnote, the court also recognized that

the website allows users to register to become part of the defendant's mailing list, indicating that

the defendant was using the website to solicit business in Illinois. *Id.* Likewise, the Northern

District of Indiana held that a website encouraging and facilitating the sale of mirror covers was

highly interactive and commercial in nature. *Litmer*, 326 F. Supp. 2d at 958. The court based its

decision on the website's ability to accept ordering information from users, such as quantity,

method of payment, and billing address. *Id.* at 957. These facts led the court to conclude that

11

the website did much more than merely "make information available to those who are interested." *Id.* citing *Zippo* 952 F. Supp. at 1124.

Similarly, Defendants and their websites do much more than make information available; the websites, are highly interactive and commercial in nature. The websites' registration processes, like those in *Publications* and *Litmer*, allows users to submit their contact information. Users are given options that are far more interactive than simply ordering a catalogue, and can choose to receive notifications from Defendants if a rebuttal is posted or receive calls from lawyers or media outlets (including those in Illinois) who may be interested in the user's report.

Moreover, Defendants' websites are commercial because they solicit book orders and payments similar to that in *Litmer*. As in *Litmer*, users select the quantity of books they want and provide payment information. The discovery indicates Defendants' have received at least 47 donations or payments via PayPal from Illinois residents from December of 2003 through 2005. *App.* at Exh. 6. Defendants solicit payments to support their commercial activities as a for-profit website. This substantial number of transactions distinguishes this case from *Hy Cite*, in which the court declined jurisdiction partly because only one Wisconsin resident bought the book and there was no record of any payments made to the Defendants. *Hy Cite*, 297 F. Supp. 2d at 1157. Since Defendants' websites accept receive payments, user information and purchase orders, the evidence is compelling that the websites are more than passively making information available— to the contrary, Defendants' websites are completely interactive and commercial.[2]

---

[2] This Court also referred the parties to the case of *Jennings V. AC Hydraulic A/S*, 383 F.3d 546 (7th Cir. 2004). That case involved a <u>passive</u> website. *Id.* at 549. Further, it involved an personal injury which was unrelated to the operation of the website. *Id.*. Thus, the *Jennings* case is clearly distinguishable from the case at bar involving an interactive website and additional commercial activities related to the cause of action.

12

Furthermore, the interactive features on the Defendants' websites and the individual conduct of Ed Magedson go well beyond those discussed in *Litmur and Publications*. In this case, the Defendants review and respond to user comments, offering advice or criticizing the content of the postings. Based on reports, rebuttals, and updates dated from approximately March 30, 2002 to August 30, 2005, Ed Magedson on behalf of Defendants has posted on the websites approximately eighty-five (85) responses to individuals who either reside within the State of Illinois, or whose postings relate to companies located in the State of Illinois. *App.* at Exh. 4 at ¶ 9 (and exhibit F attached to Declaration). Defendants advise website users that trivial comments will not be accepted and postings will be treated like letters to the editor, and if accepted by the badbusinessbureau.com Review Board, they will be posted within 72 hours." Third Black Decl. exh. M. Defendants further interact with users through email. The Defendants' website invites users to email them and the discovery received to date indicates that Defendants *responded* to emails sent by Illinois residents. *App.* at Exh. 2, pages 10-24; Exh. 3.

Moreover, the correspondence clearly indicates that Defendants seek to enter into contractual relationships with attorneys located in the state of Illinois for their own profit. As noted above, Defendants have referred individuals to The Lakin Law Firm of Wood River, Illinois, and have sought to enter into a relationship with the Blim and Edelson law firm to the tune of $800,000. *App.* at Exh. 3, pages 2-3, 53-54, 85-86.

Finally, Defendants' counsel **admitted** to this Court that it take "probably one" customer, or at least one big customer to do business in Illinois. Transcript of June 9, 2005 hearing, page 21, attached to the instant brief as Exh. 2. Defendants have far exceeded having one customer in Illinois. This type of interaction goes beyond simply making information available and exemplifies the commercial purpose and interactive nature of the Defendants'

13

websites. The interactions between Defendants and users, including business transactions, strongly support exercising jurisdiction.

## III.   DEFENDANTS' CONTACTS WITH THE STATE OF ILLINOIS ARE CONTINUOUS AND SYSTEMATIC, SUBJECTING THEM TO THE GENERAL JURISDICTION OF THIS COURT.

Contrary to Defendants' assertions, the nature of their contacts with the State of Illinois is continuous and systematic such that they can be subject to general jurisdiction of this Court. "A party with extensive contacts in a state can be subject generally to the personal jurisdiction of Illinois courts." *Kavo*, No. 00-C-1355, at *10.   To find general jurisdiction, Defendants must have continuous and systematic general business contacts with Illinois. *Helicpteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). The contacts must go beyond those related to the action for general jurisdiction to exist. *Publications*, 121 F. Supp. 2d at 1182. quoting *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992). A finding that a nonresident defendant is doing business in Illinois so as to maintain a presence here subjects a defendant to the personal jurisdiction of Illinois courts for all matters. *Kavo America Corp. v. J.F. Jelenko & Co.*, No. 00-1355, 2000 U.S. Dist. LEXIS 7729, at *10-11 (N.D. Ill June 1, 2000).

This Court has exercised jurisdiction over non-resident defendants doing business in Illinois in several circumstances, all of which are present in this case. In *Kavo*, the court exercised general jurisdiction based on business transactions, the maintenance of an interactive website, and the presence of two sales representatives in Illinois. *Id.* at 11. Similarly, in *Publications*, the court exercised general jurisdiction over the defendant solely on the basis of defendant's interactive website and announcement in a newsletter of an Illinois business representative. 121 F. Supp. 2d at 1183.

In this case, the Defendants conduct business transactions in Illinois, recruit Illinois attorneys, posters and volunteers, and maintain an interactive website. The Defendants

14

continuously solicit payments through their website and have received at least 47 donations or payments from Illinois residents. *App.* at Exh. 4 at ¶¶ 4-5; Exh. 6. In addition to the donations, according to Defendants' discovery they have sold at least 13 copies of their book to individuals within Illinois at a price of $21.95. *App.* at Exh. 2, pages 8-9. These contacts alone constitute a minimum of 47 individual transactions, which are arguably unrelated to the activities that give rise to this cause of action. Illinois courts have exercised jurisdiction in instances where the number of unrelated sales was as little as four to seven. *Deere & Co v. Howard Price Turf Equipment, Inc.*, No. 99-4169, 1999 U.S. Dist. LEXIS 18668, at *3 (N.D. Ill. Nov. 30, 1999)(exercising general jurisdiction over defendant who had less than five transactions because that was sufficient to show defendant was doing business in Illinois). Even if these transactions do not amount to a great percentage of Defendants' total revenue, Illinois courts have held that as little as .47% of revenue is sufficient to confer jurisdiction in appropriate circumstances. *Colletti v. Crudele*, 523 N.E.2d 1222, 1225 (Ill. App. Ct. 1988). These twenty three transactions are a substantial amount of commercial business over a considerable amount of time, thus showing that Defendants maintain continuous and systematic contacts with Illinois. *Hy Cite*, 297 F. Supp. 2d at 1162 (noting that a defendant's substantial internet sales with the forum state may solely support a finding of jurisdiction). In addition, as one of the payments is clearly from GSMIC competitor, there is at least one payment directly related to this cause of action. *App.* at Exh. 2, page 6.

Defendants further demonstrate continuous and systematic contacts with Illinois by recruiting lawyers in Illinois and soliciting volunteers to report on "bad businesses." *App.* at Exh. 4 at ¶¶ 6-7. The website dedicates an entire section to recruiting volunteers and provides a link for those interested to contact the Defendants directly. *App.* at Exh. 4 at ¶ 7. In addition, the individuals that post reports act as representatives of the Defendant when they choose to be

15

contacted by lawyers and media outlets in connection with their postings. By doing so, these users act in conjunction with the Defendants to achieve the same ends. One example shows that a Chicago news reporter contacted the Defendants in order to obtain a user's contact information. *App.* at Exh. 3, page 10. The Defendants are willing to give the user's information and even requested that the webpage be shown and mentioned in a news story regarding the user's report. *App.* at Exh. 3 page 6. By doing so, the Defendants associate themselves with the user who created the report.

In addition to the representatives from Illinois and the business conducted in Illinois, the Defendants maintain an interactive and commercial website as explained above. These factors go beyond the minimum threshold requirements used to find systematic and continuous contacts, therefore, this Could should exercise general jurisdiction and deny the Defendants' motion.

## IV. DEFENDANTS' CONTACTS ARE SUFFICIENT TO ESTABLISH SPECIFIC JURISDICTION.

### A. Jurisdiction is appropriate under the "effects test."

This Court has specific jurisdiction over Defendants if the Defendants have: (1) sufficient minimum contacts with Illinois, "that is, [they] must do some act or consummate some transaction with the forum state," or perform some act by which they purposefully avail themselves of the privileges of conducting activities in Illinois, and thereby invoking the benefit and protections of Illinois' laws; (2) the claims arises out of or results from Defendants' Illinois-related activities; and (3) the exercise of jurisdiction must be reasonable. *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F.Supp. 2d 824, 835 (N.D. Ill. 2000). In addition to the analysis used to determine whether Defendants' Internet activities subject them to jurisdiction, Defendants can be subject to the jurisdiction of this Court by the "effects test" enunciated in *Calder v. Jones*, 465 U.S. 783 (1984). Both the Internet "sliding scale" approach and the

"effects test" bear on whether Defendants established minimum contacts and purposefully availed or established contacts with the State of Illinois such that the exercise of jurisdiction is reasonable. The effects test allows a court to exercise personal jurisdiction "when 1) the defendant's intentional tortious actions 2) expressly aimed at the forum state 3) causes harm to the plaintiff in the forum state, of which the defendant knows is likely to be suffered." *Euromarket*, 96 F.Supp. 2d at 835 (*citing Calder v. Jones*, 465 U.S. at 789-90). All three elements are satisfied in this case, thus the exercise of jurisdiction under this analysis is proper.

In *Calder*, the Supreme Court exercised jurisdiction over a magazine editor for his role in a libelous article that was disseminated in California. 465 U.S. at 789. The court held that his participation as editor was tortious even though he was not directly responsible for the dissemination of the article in California. *Id.* Furthermore, the Northern District of Illinois notes that the "general rule for defamation is that everyone who takes a responsible part in the publication is liable for the defamation." *Cohen v. Charell*, No. 82-4408, 1983 U.S. Dist. LEXIS 14656, at *12 (N.D. Ill. Aug. 12, 1983), citing *Jones v. Calder*, 187 Cal. Rprtr. 825, 829 (Cal. Ct. App. 1982). In this case, Defendant Ed Magedson clearly admits to being the "EDitor" of the websites and employs, via XCentric, employees who review and edit the report. Defendants' argument that they are not responsible for the website's subject matter is untenable--as it was in *Calder*. Moreover, Defendants here are also responsible for disseminating the website world-wide. As the editors and disseminators of the defamatory and misleading reports, the Defendants acted intentionally and tortiously against GSMIC.

Moreover, in *Calder*, the Supreme Court determined that the libelous conduct was directed to the forum state because California was the focal point of the story, and the harm was suffered by a California resident. *Calder*, 465 U.S. at 789. Similarly, the focal point of the defamatory reports on Defendants' website was GSMIC's executives and employees, who

17

suffered harm to their reputation and are principally located in Illinois. The reports highlight this focus on Illinois by listing GSMIC's Illinois address on every report in large, bold font. *App.* at Exh. 2, pages 26-103. Defendants further targeted GSMIC through the use of metatagging, adding the words "George S May International Company ripoff" to webpages' properties so the reports would be readily located by individuals searching the Internet through popular search engines such as Google. *App.* at Exh. 4 at ¶ 12 (and exhibit I attached to Declaration).

Moreover, the Seventh Circuit interpreted the effects test in *Indianapolis Colt v. Metropolitan Baltimore Football Club Limited Partnership* to include a non-resident defendant's entry into the state via a television broadcast in Indiana. 34 F.3d 410, 412 (7th Cir. 1994). Likewise, Defendants entered Illinois through an accepted medium—the Internet. In each case, the defamatory and infringing information was disseminated through a medium to the forum state. This entry into Illinois and aiming defamatory reports at GSMIC, an Illinois company, show that the Defendants directed their tortious conduct toward Illinois.

Finally, according to Supreme Court jurisprudence and the Seventh Circuit, a tortfeasor is aware that the brunt of the injury will be felt in the state where the plaintiff resides. *Calder,* 465 U.S. at 789-90; *Indianapolis Colts,* 34 F.3d at 412. In *Calder,* the court found the respondent would suffer emotional distress and injury to her professional reputation in California because that is where she lived and worked. 465 U.S. at 789-90. Similarly, GSMIC and its employees suffered harm to its reputation in Illinois, where GSMIC and its employees principally reside. The harm to GSMIC's reputation is exemplified in letters to GSMIC from existing clients and potential employees terminating their association with GSMIC. See Correspondence, attached as Exhibit 1 to this brief. Furthermore, Defendants are certainly aware of the wide reaching affects of their website. According to the website, once a report is filed, it "will be discovered by millions of consumers." *App.* at Exh. 4 at ¶ 6 (and exhibit C attached to Declaration).

18

Defendants further advise users that their reports may result media attention and legal action, and in fact Defendants do provide information to the media and refer individuals to law firms with whom Defendants have a relationship. *Id.* Clearly, Defendants are aware of the wide-reaching, negative effects resulting from their website.

In summary, the defamatory reports were edited and disseminated by the Defendants knowing where GSMIC is located, thus they intentionally participated in tortious conduct directed at an Illinois company and its employees. Furthermore, Defendants are well-aware of the negative affects and far reach of the reports on their website—and intend this damage to occur. The more negative the content of the websites, the more users will visit the websites, thus increasing revenues for the Defendants in the form of donations, book sales, referral arrangements with attorneys, and advertising. Defendants' actions indicate that they purposefully directed their conduct where GSMIC would suffer the most harm—Illinois. For these reasons, the effects test is satisfied and this Court may exercise jurisdiction. Thus, the Defendant's Motion to Dismiss should be denied.

**B.    Defendants use of metatags constitutes sufficient minimum contacts with Illinois.**

The Defendants' use of the GSMIC trademark through metatagging also constitutes minimum contacts with Illinois. Metatags are part of the code that makes up a web page. When a search engine, such as Google.com, searches the internet, it looks for keyword and descriptive metatags matching the search terms the user entered. *Morris Material Handling, Inc. v. MHE Technologies, Inc.*, 334 F. Supp. 2d 1118, 1121 (E.D. Wis. 2004)(citation omitted). The more often a key word appears in metatags, the more likely that page is to be "hit" in a search, and the higher it will appear on the list returned by the search engine. *Id.* Thus, by improperly using GSMIC's trademark through metatagging, Defendants divert users to their website.

In *Morris*, the Eastern District of Wisconsin exercised jurisdiction over a Finnish corporation. *Id.* at 1126. The corporation itself did not have contacts within the United States, however, it placed metatags on its subsidiaries' websites, which were directed at the U.S. *Id.* at 1124. The court also noted, that even though the defendant corporation was not responsible for the contents of the website, it still owned the website, thus jurisdiction was proper. *Id.*

Similarly, Defendants use metatags of the GSMIC trademark to direct people to their website through search engines. *App.* at Exh. 4 at ¶ 12 (and exhibit I attached to Declaration). Although Defendants' deny metatagging, the webpage properties clearly show that the terms "George S May International Company ripoff" are encoded into the websites. *Id.* Moreover, while Defendants have previously argued that they are not responsible for the content of the postings on their website, *Morris* indicates that this is not dispositive because ownership of the website will be sufficient to confer jurisdiction. *Id.* In Euromarket, the Northern District of Illinois followed the Ninth Circuit's analysis by using a "but not for" analysis to conclude whether a claim arose out of the defendant's minimum contacts. *Euromarket*, 96 F.Supp. 2d at 839, citing *Panavision Int'l L.P v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998). In this case, but not for the Defendants' improper use of GSMIC's trademark through metatagging, the defamatory reports would not have been widely disseminated and harmed GSMIC's reputation, and thus injury to GSMIC. As Defendants' metatagging shows sufficient minimum contacts with the State of Illinois, and as GSMIC's claims and injuries arise, at least partly, out of Defendants' use of the "George S. May" metatag, Defendants' are subject to the jurisdiction of this Court, and their motions should be denied.

## V. THIS COURT'S EXERCISE OF JURISDICTION OVER DEFENDANTS IS REASONABLE.

Once the first two elements of specific jurisdiction are satisfied, a defendant who seeks to defeat jurisdiction must present a compelling case that the presence of some other considerations render jurisdiction unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Many courts, including the *Euromarket* court, follow this principle, which shifts the burden to the Defendants to show that exercise of jurisdiction is unreasonable. *Litmer* 326 F. Supp. 2d at 959; *Euromarket*, 96 F. Supp. 2d at 839. Generally, however, to determine what constitutes "reasonable," courts utilize a seven factor test that includes: (1) the extent of a defendant's purposeful interjection, (2) the burden on the defendant, (3) the extent of conflict with the sovereignty of the defendants' state (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the plaintiff's interest in obtaining convenient and effective relief, and (7) the existence of an alternative forum. *Euromarket*, 96 F. Supp. 2d at 839. In this instance, Defendants have not specifically argued that this Court's exercise of jurisdiction is unreasonable, howeve, all factors weigh towards exercising jurisdiction.

In this case, Defendants' purposeful interjections are substantial because they solicited and conducted business in Illinois through their website, utilized metatagging to direct their users to information about an Illinois company, and published false and misleading reports concerning an Illinois company that were distributed within Illinois and engaged in commercial activities in Illinois. *U.S. Tsubaki v. Industrial Research Team*, No. 00-4447, 2001 U.S. Dist. LEXIS 967 at *10. (N.D. Ill. Jan. 31, 2001). The Defendants' burden of litigating in Illinois is insignificant because the inconvenience is not so great as to overcome clear justifications for the exercise of jurisdiction. *Euromarket*, 96 F. Supp. 2d at 840. As to all the factors, including conflict of sovereignty, the Defendants do not raise issue or suggest that a related suit is pending in Arizona. *U.S. Tsubaki* 2001 U.S. Dist. LEXIS 967 at *11. Illinois' interest in this matter is an important

21

factor because the issues involve, among other things, unfair practices against an Illinois business. *LFG, LLC v. Zapata Corp.*, 78 F. Supp. 2d 731, 739 (N.D. Ill. 1999). Because of modern advancements in communications and transportation, there is no reason why another forum would be more efficient or convenient than Illinois. *Euromarket*, 96 F. Supp. 2d at 840. Under the "convenient and effective relief for plaintiff" factor, it is more convenient for GSMIC to litigate in Illinois, and the causes of action, such as the Lanham Act and Illinois Unfair and Deceptive Trade Practices Act, suggest that proper relief should be obtained in Illinois. *Id.* at 841. In consideration of those causes of action, Illinois is the appropriate forum. *U.S. Tsubaki*, 2001 U.S. Dist. LEXIS 967 at *12. These factors weigh heavily toward the reasonableness of this Court exercising jurisdiction over the current matter.

## V.    PLAINTIFF HAS NO CONTRACTUAL AGREEMENT WITH DEFENDANTS REQUIRING SUIT IN ARIZONA.

Finally, in XCentric's Motion to Dismiss, XCentric claims that GSMIC is bound by a "forum selection clause" which purports to limit jurisdiction to the "State of Arizona." Defendants claim that GSMIC is bound by a "forum selection clause" based on a posting it attached as Exhibit C to its previously-filed Defendants Memorandum of Law in Opposition to Preliminary Injunction (Defs. Mem.). The facts (not mentioned in Defs. Mem.) but which are stated in the posting, are that an individual, who also claimed to be one of GSMIC's employees, noticed that someone had "spoofed" his identity, by stealing his email address and identifying information, and used that information to post material on Defendants' websites. See Third Black Decl. at ¶ 4(g). This individual responded by posting a rebuttal on Defendants' websites, indicating that the material on the website did not originate from him, and that it did not reflect his point of view. *Id.* According to the named Defendants, because the individual, who also

claimed to be an employee of GSMIC, posted a rebuttal on the website, GSMIC is irrevocably bound to sue in the State of Arizona. This argument is wholly without merit.

Moreover, XCentric misleads the Court because the language of the purported "forum selection clause" has not always been on the website. When the Defendants filed their Memorandum of Law, they attached, as Exhibit D, the language of the purported forum selection clause which they claim applies to GSMIC. It stated:

> By posting this report/rebuttal, I attest this report is valid. I am giving Rip-off Report irrevocable rights to post it on this web site. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes **between me and the operators of Rip-off Report arising out of this posting**.

Mysteriously, the above-quoted language has changed, and now states in relevant part "Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes arising out of this posting." Third Black Decl. Exh. M.

In any event, based solely on the terms of the clause—it expressly does not apply to GSMIC. It is clearly limited to disputes arising **"between me and the operators of Rip-off Report arising out of this posting."** Therefore, the named Defendants' argument is spurious and without basis in fact or law. Under no reading of that language can it be read to rope in all of the other postings that are false, deceptively misleading, and defamatory regarding GSMIC, particularly since those postings have not been posted by or rebutted by anyone connected with GSMIC.

Furthermore, the named Defendants' argument that they entered into a contract with GSMIC is ridiculous. The language containing the purported "forum selection" clause belies this point; it never states that the poster agrees to enter into any type of contractual relationship with the named Defendants. None of the elements of a contract are present here; particularly, there

was no mutual assent on behalf of GSMIC to be bound to any agreement with Defendants—one employee of GSMIC was protecting his own personal name and reputation.

Since the named Defendants cannot honestly claim that they entered into any sort of contract with GSMIC, they resort to claiming that the individual, whose identity was stolen and attributed to a posting on the websites, had apparent authority to bind GSMIC to the "forum selection" clause. Defendants have cited no cases to support their claim of apparent authority; the sole case cited in support of their claim did not rely on agency principles for its holding; and the named Defendants do not offer any elucidation of what law would apply in determining apparent authority.

Principles of agency law are substantially similar in Illinois, Arizona, and Georgia (where the employee was located).[3] Under Illinois law, apparent agency is created if "(1) the principal consents to or knowingly acquiesces in the agent's conduct, (2) the third party has a reasonable belief that the agent possesses the authority to act on the principal's behalf, and (3) the third party relied to his detriment on the agent's apparent authority." *Bethany Pharmacal Co., Inc. v. OVC, Inc.*, 241 F.3d 854, 859 (7th Cir. 2001). In this case, there is absolutely no evidence that GSMIC ever consented to or even knew that the employee posted a response on the websites. Additionally, the named Defendants cannot credibly have relied on the individual's apparent authority. It would have been unreasonable for them to rely on an individual's rebuttal to an individual posting, when this individual was provoked by the fact that an anonymous individual had stolen this individual's identity, and never purported to represent anyone other than himself or concern himself with any other postings!

---

2       *See, e.g., Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 859 (7th Cir. 2001); *Max of Switzerland, Inc. v. Allright Corp. of Delaware*, 187 Ariz. 496, 500 (Ariz. Ct. App. 1997); *Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc.*, 44 F.Supp. 2d 1348, 1998 U.S. Dist. LEXIS 22313, at * 13-17 (N.D. Ga. 1998).

24

In any event, Illinois law clearly indicates that "[a]n agent's apparent authority can only be determined by evaluating the principal's conduct toward the third party. Specifically, the principal must do something to lead the third party to believe that the agent is authorized to act on its behalf. The agent cannot unilaterally create an apparent agency through her own words or conduct." *Bethany*, 241 F.3d at 859-60. GSMIC put the named Defendants on notice over a year ago that it was requesting the remove the false and deceptively misleading postings on websites. See Declaration of Charles E. Black ("1st Black Decl.") Exh. B. The named Defendants could not reasonably rely on this individual's rebuttal when GSMIC's counsel is already in contact with them, objected to the postings on the site and threatened legal action. Defendants cannot honestly claim that it could rely on the individual's rebuttal as evidence that GSMIC agreed to only sue Defendants in Arizona.

## CONCLUSION

Defendants' activities are clearly sufficient to establish that this Court has personal jurisdiction over them. Defendants' websites are clearly interactive. A review of the websites and the discovery produced by Defendants to date establishes that Defendants: 1) have transacted business with individuals and businesses in Illinois, including receiving payments from individuals for the operation of the web sites and book sales; 2) negotiated with and referred business to Illinois law firms and lawyers; 3) actively communicated with individuals ; 4) has an agreement with a subcontractor to procure advertising from nationally-known companies on the websites; 5) uses metatags on its websites so searches in Internet search engines will readily uncover the reports; and 6) makes money from the false, defamatory, and harmful postings by increasing readership, thereby increasing revenues from advertising, lawyer referrals, donations, and sales of the "Rip-off Revenge Guide." Finally, because Defendants clearly edit the reports related to GSMIC, put "George S. May" in the websites' metatags, and

25

clearly have knowledge of the harm these postings do to GSMIC, Defendants actions were

purposefully directed at GSMIC such that the brunt of the harm is felt by GSMIC in Illinois.  For

these reasons, Defendants' Motions to Dismiss for Lack of Jurisdiction should be denied.


**DATED:  September 2, 2005**            Respectfully submitted,

                                          GEORGE S. MAY INTERNATIONAL COMPANY

                                          By: _Rachel M. Kindstrand_
                                              One of Its Attorneys

Attorneys for Plaintiff:

Bart A. Lazar, Esq.
Rachel M. Kindstrand, Esq.
**SEYFARTH SHAW LLP**
55 East Monroe, Suite 4200
Chicago, Illinois  60603
Telephone:  (312) 346-8000
Facsimile:  (312) 269-8869
Firm No. 90747

26

## CERTIFICATE OF SERVICE

I, Rachel M. Kindstrand, hereby certify that a copy of **PLAINTIFF GEORGE S.**

**MAY'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FOR**

**LACK OF PERSONAL JURISDICTION** was served on the following opposing counsel via

messenger delivery on September 2, 2005:

> James K. Borcia, Esq.
> David O. Yuen, Esq.
> Tressler, Soderstrom, Maloney & Priess
> 233 South Wacker Drive, 22nd Floor
> Chicago, IL  60606-6308

Rachel M. Kindstrand

**EXHIBIT 1**

06/01/2005  14:32    1

# NOTICE OF SALE - ENTRY
## (PLEASE PRINT)

( X 110 )

JOB NO. 526-856-01    A/U _____

$ _____ 100.2

NAME  E B Construction Mechanical contractors, Inc.

STREET  2901 central AVE.

CITY  Birmingham    ST  AL,  ZIP  35209    MLG _____

DBA _____

CLASS  S    GRADE  C    CO  USA  DIV  S

VOLUME  1000,000    EMPLOYEES  70

COUNTY #  Jefferson Co.  (61547)    SIC  1711

PHONE _____    Orig/G: _____

HOME PHONE _____    FAX NUMBER _____

DISTRICT  40    E-MAIL _____    SALE DATE  5-31-05    ORIG SIS DTE  6-2-05

DM  47697

(3 owners)

* 5/31/05 - Client called to cancel. Stated he did not want us
in his business after research on the internet revealed
Rip Off Report website entries. Used T H B Lisa S

| | CT | LAST NAME | S | PAR | | DM | RM | SRT | ARM | MS2 | CT | LAST NAME | PAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SR1 | 6 | | | 14 | | | | | | | | Balmer | |
| ADM1 | 224549 | Sherman | | | | | | | | | | | |
| ADM2 | | | | | | | | | | | | | |
| TEL | | | | | | | | | | | | | |
| MS1 | | | | | | | | | | | | | |



# $100 SURVEY

## CONTACTS WITH CLIENT

| DATE | LETTER | PHONE | PERSONAL | REMARKS |
|------|--------|-------|----------|---------|
| 5/20 | | | OK | Beth Mosenales called on behalf of Wm Duke to OK. Found clendy at our - in 1990 on interior |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Duke's Plumbing & Sewer
Service, Inc.
Syracuse, NY 13209    528125



Subject: Rip Off. Com

Client's Name: Christoff + Sons    Staff: [signature]

Job No: 515, 904    Date: 4/14/05

Called Client to do N.B.R.S.

1) Mr Christoff said he chose to not do
go ahead in June, 2004 because of
messages on internet under this web
site.

2) I told him re: Better Business Bureau
Torch Award plus 80 th year in
business. While he was unable to offer
an explanation for the award, he
said he declines Resurvey due to
internet assertions cited above

[signature]

COPYRIGHT 1991
GEORGE S MAY INTERNATIONAL COMPANY
All Rights Reserved

Form 970



*Pools and Spas by*

# V AN BRILL INC.

(856) 218-8233

*Fax* (856) 218-8236

*P.O. Box 410* • *625 Mullica Hill Rd.* • *Richwood, NJ 08074*

May 4, 2005

To: The George May Company

Thank you for the time that you spent meeting with us. However, because of some research that was done on your company using the internet we are not sure at this time your company could benefit us at this time. The information obtained was from Bad Business Bureau.com

We would like to have more time to look into your company and the services you have to offer and then make a determination on whether or not to use your services.

Sincerely,

Mike VanBrill



*Stay Cool in a Van Brill Pool*

## Management Services

| | |
|---|---|
| **From:** | Rob Viehman [rviehman@cubafreepress.com] |
| **Sent:** | Tuesday, March 01, 2005 10:45 AM |
| **To:** | Management Services |
| **Subject:** | Re: Working Agreement |

*Mr. Lau Bach,*

*Believe me when I say I did not take everything posted on that website about your company as the gospel. I have no doubt your company has provided excellent work for many businesses throughout the years. If that was not the case, you would no longer be in business.*

*However, any business owner would be concerned after reading what is posted on that site, especially some of the comments from one of your ex employees who described to the letter the way your analyst conducted himself while he was at my business. Since I have no verifiable third party that I can trust give me an honest opinion about the work you provide and how you conduct business, I cannot do business with your company.*

*If, indeed, you are the reputable firm you claim to be, you will respect my decision not to do business with you and discontinue any further contact with me or my staff as I requested in my original letter. If you requested the same of me, I would honor your request. If I hear from you further, then I will know I was correct in choosing to terminate our business relationship.*

*Sincerely,*

*Rob Viehman*
*Three Rivers Publishing*

## Charles E. Black

**From:** gm [advanceil@bellsouth.net]
**Sent:** Friday, February 25, 2005 1:03 PM
**To:** Walt Winkelman
**Subject:** Re: CareerBuilder.com: Exceptional Sales Career Opportunity

**Thank god for the internet blogs! I will never work for you - your a fucking dinosaur in 6 more months - go check out your flames. at badbusinessburea - you suck**

al Message -----

From: Walt Winkelman
To: GREG MICHAEL
Sent: Friday, February 25, 2005 11:14 AM
Subject: CareerBuilder.com: Exceptional Sales Career Opportunity

Dear Job Applicant,

Your resume has been automatically selected to receive this email through a computer generated search of the Career Builder database for sales candidates in your region.

"Interviews" are now being scheduled in a city near you "this week" for a training class that starts "next week" in Chicago. Applicants from "out of town" will interview in that city, but work in their local area.

The George S. May International Company (GSMIC) an industry leader in management consulting to small and medium size businesses since 1925, is currently scheduling interviews for outside sales professionals for the position of Special Representative - Field Service.

"Please" visit our website at www.georgesmay.com "before" you call to learn more about the George S. May International Company. There is an informative video about the Special Representative position that can be viewed online in the "careers" section titled "Careers in Field Service".

If you are confident in your sales ability and would like to pursue a career sales opportunity with GSMIC please contact Mr. Bryan Cook ASAP at 800-999-3020 ext. 414 (8:30am-5pm CST M-F) to present your qualifications and schedule an interview.

We look forward to hearing from you, or if this is not a match for your skills and abilities, best wishes in your job search.

Thank you,

Walt Winkelman
Director of Recruiting
Recruiting Department
GSMIC

2/28/2005

## GSMAY

| | |
|---|---|
| **From:** | aton_ra_1999@yahoo.com |
| **Sent:** | Sunday, February 27, 2005 8:32 PM |
| **To:** | careers@georgesmay.com |
| **Subject:** | Important! Field Service Training |

Mr. Winkleman:

After extensive online research of George S May Company, a large number of COMPLAINTS and CHARGES were reported nationwide by dozens of people and firms against your company.

Employees and past clients of George May wrote detailed accounts of mismanagement, deceit, coercion, and generally unethical business behavior. One consumer website alone had nearly 30 complaints listed, with specific dates, company officials named, and very detailed accounts of poor business practices by your firm. The Better Business Bureau inexplicably gave your company a "satisfactory rating", but closer examination of the file reveals 18 cases that were not resolved, and others that the Bureau deemed "closed" but complaintants disagreed and said were not resolved to their satisfaction.

Another website featured an article in a large newspaper that described how a startup company was charged exorbitant fees by George May analysts who were accused of being "unqualified" and "extremely pushy salespeople, not business consultants." Many clients reported that they signed iron-clad contracts due to near-fanatical analysts hammering them with horror stories and misinformation over an extended period of time. These contracts obligated clients in ways they did not understand, and were then held financially liable, even when the company itself was in serious financial straits. Many of these clients wanted to engage in a CLASS-ACTION LAWSUIT against George May, but recognized they were legally trapped by the confusing contracts they signed, and the verbal misrepresentations by the Field Services Rep and the Analysts.

Finally, my interactions with you personally revealed some of the same patterns of misinformation and unprofessional business behavior listed by some anonymous employees of your company. This includes ridiculously short time frames for decision-making, excessive compliments that are not warranted or justified, psychological manipulation to achieve compliance, untruthful statements or massive exaggerations to convince applicants about company policies and practices, and finally ... your telephone behavior is fairly atrocious with numerous 5 - 10 minutes holds, which is completely inexcusable in any telephone conversation, and even more unimaginable from the human resources department of a so-called management consultant firm. When I tried to call you back both yesterday and today, again you had no voicemail, so there was no way to leave you a message. Its incomprehensible that the HR Director would not have his voicemail activated.

In addition, your company policies of "mandatory insurance limits" set at a company-determined level with your company named as "additional insured" .... along with your training class reimbursement procedures, which ensure no reimbursement to the trainee if ANY problems develop during the training session (with problems defined solely by George May company) reinforces the comments made by ex-employees who stated that if a trainee doesn't "tow the line 100%" in every way, they will be kicked out of training, and all expenses incurred will be the responsibility of the trainee. In other words, a healthy exchange of ideas and open, honest discussions are not permitted, its exclusively the George May way, or the highway (on your own charge card, mind you).

Based on this information, it is clear that your company has a very negative reputation, and if even a handful of the allegations are true, it demonstrates a company that does business in a way that I want absolutely nothing to

do with.  79 years in business does not signify that your company follows the same principles of integrity and honesty as the person who founded it ... George May could have been bought out several times over the past decades, and the current management follows a business pattern that is predatory and damaging to many employees and clients who have the misfortune of professionally interacting with them.

Destroy my resume, and eliminate my application from your files.  My relationship with your firm is terminated immediately.

B. Dreyfus

---

Do you Yahoo!?
Yahoo! Mail - Helps protect you from nasty viruses.



# Cuba Free Press    The Extra Plan

501 E. Washington Street
PO Box 568
Cuba, MO 65453

573-885-7460
FAX: 885-3803
rviehman@cubafreepress.com

www.cubafreepress.com

# Steelville Star-Crawford Mirror

106 S. First Street
PO Box BG
Steelville, MO 65565

573-775-5454
FAX: 775-2668
stvlstar@misn.com

www.steelvillestar.com

To: George S. May International Company
FAX: 847-825-7937

February 25, 2005

From: Rob Viehman, Publisher

Re: Job No. 525442

Consider this official termination of my contract with the George S. May International Company. After meeting Thursday, February 24 and Friday, February 25, 2005, with one of your "executive analysts," I was somewhat excited, although nervous, about entering into a business relationship with your firm.

My excitement quickly turned to anger, however, when I did some extensive research about George S. May International on the Internet. Aside from information included on your own website, I could not locate one positive story about your firm. Quite to the contrary, I found many negative comments which I will not include in this letter. I'm sure the executives at George S. May are well aware of the complaints made about this firm.

Your company has at least two representatives scheduled to be at my Cuba, Mo., office on Monday morning, February 28. I am formally requesting their planned trip be canceled because they will not be allowed on the premises. Should they show up on Monday, they will be asked to leave immediately.

In addition, should I be contacted further by your company, I will file an official complaint (which will include a copy of this letter) with the Missouri Attorney General. I will also be contacting all my sister publishers throughout Missouri to inform them of your business practices, with the recommendation they inform their readers and business clients as well.

Looking back now at the last two days I wasted with your analyst, I now realize I received absolutely nothing for his $350 fee. I'll consider that a lesson learned.

With BIG regrets,

Rob Viehman
President/Publisher

*Chuck Block*

Sandry Cronin

| | |
|---|---|
| From: | "Thomas H. Jones" <tomjones@reihawali.com> |
| To: | <agbltd@AOL.com> |
| Cc: | <scronin@georgesmay.com> |
| Sent: | Friday, November 19, 2004 3:54 PM |
| Subject: | sales agreement |

Arthur,

Part of the reason we did not agree to proceed with George S. May on a consulting agreement today is due to the information we found on the following web sites.

http://badbusinessbureau.com/reports/ripoff71324.htm
http://badbusinessbureau.com/reports/ripoff59860.htm

Sincerely,

—
Thomas H. Jones
President
REI Food Service, LLC
d.b.a. Gyotaku Japanese Restaurants

*Job # 523077 -01*
*Analyst Arthur Barron*

*BART LAZAR*
*SEYFARTH*

11/19/2004

## GSM Job Survey

**From:** Eric [eric@3011grand.com]
**Sent:** Monday, October 11, 2004 9:27 AM
**To:** GSM Job Survey
**Subject:** Re: Monday Interview

I won't be attending. Some research unveiled that your company is a fraud. If I were you, I'd get out now.

Eric

*GSM Job Survey <gsmjobsurvey@georgesmay.com>* wrote:

Hello Eric,

My name is Aminatu with George S. May International Company. I spoke with you concerning an interview for Monday 11, 2004 located at the Marriott Courtyard 7901 N Tiffany Spring in Kansas City, MO 64153. The number to the hotel is 816-891-7500. You will interview with one of our Senior Executives, Mr. Randall Zech. Ask for him at the front desk of the hotel when you arrive. As I stated in our conversation, you will need to bring a copy of your resume and a two-page application, which can be downloaded from our web site at www.georgesmay.com. The application form is in the career section, just fill it out and bring it with you to the interview. Also, please view the corporate video that states career in Survey Service for the Analyst position, which is also found at the same web site. If you have any questions or concerns, please give me a call.

Time 10:00 am

Thank you,

Aminatu EL-Mohammed
800-999-3020 ext. 410
www.georgesmay.com

## GSM Job Survey

**From:**   Mark Brady [brady.mark@sbcglobal.net]

**Sent:**   Tuesday, October 12, 2004 11:37 AM

**To:**   GSM Job Survey

**Subject:** RE: Tuesday Interview

Aminatu,

I have done some research into the George S. May Company and the position, and as a consequence, I have changed my mind. I am not interested in applying.

I do regret to cancel the interview at this late hour, but there is little sense in wasting more of Mr. Zech's time.

Thank you.

Mark Brady

-----Original Message-----
**From:** GSM Job Survey [mailto:gsmjobsurvey@georgesmay.com]
**Sent:** Monday, October 11, 2004 3:26 PM
**To:** brady.mark@sbcglobal.net
**Subject:** Tuesday Interview


Hello Mark,

My name is Aminatu with George S. May International Company. I spoke with you concerning an interview for Tuesday 12, 2004 located at the Marriott Courtyard 9190 Gulf Freeway in Houston, TX. 77017. The number to the hotel is 713-910-1700. You will interview with one of our Senior Executives, Mr. Randall Zech. Ask for him at the front desk of the hotel when you arrive. As I stated in our conversation, you will need to bring a copy of your resume and a two-page application, which can be downloaded from our web site at www.georgesmay.com. The application form is in the career section, just fill it out and bring it with you to the interview. Also, please view the corporate video that states career in Survey Service for the Analyst position, which is also found at the same web site. If you have any questions or concerns, please give me a call.


. Time 2:00 pm

Thank you,

Aminatu EL-Mohammed
800-999-3020 ext. 410
www.georgesmay.com

## Write Off Authorization

To: CONTROLLER (2)

From: MANHAM

Subject: WRITE OFF

Date: November 26, 2003

Division: HAM

Write Off: $10,720.23

---

Job No: 508724-01
Client: Fence Depot
Address: 700-D Cumberland
City: Cornwall    State: ON    Zip: K6J4J7
Client Contact: Mr. John Locke

---

1. This job was run by:    Project Director: Mr. Ray Gustafson
   Executive Analyst: Mr. Erwin
   Sales Rep:

2. This write off represents **partial** billing for:

   Period 12 Week 03 Year 03

3. Complete Reason for failure to collect cash:

   When the invoice was presented (on Friday 11/21/03) the client refused to pay it, stating that he understood he would get everything for $5,000.Canadian. An Agreement was reached (copy of Progress Report is attached) to provide five program points at no cost to the client, and upon completion the client agreed to pay the invoice. On Saturday 11/22/03 Mr. Gustafson was met by the Royal Canadian Mounted Police and asked to leave the client's business. Mr. Locke stated that he had seen the Rip Off .com web site and had concerns about the company. At this point a copy of the Better Business Bureau Torch Award Letter, and our attornery's letter concerning Rip Off .com were faxed to the client. The client was then contacted by CHEMS and a settlement of $5900. Canadian was offered. Mr. Locke refused all efforts to reach a settlement.

4. **Action: Collections Department**

   | | |
   |---|---|
   | ☐ Make no effort to collect | |
   | ☐ Make an effort to collect | |
   | ☒ Check with Managing Director on: 12/10/03 | |
   | ☐ Other: | |

   **Action: Accounting Department**

   | | |
   |---|---|
   | ☐ Settlement (remove from receivables) | |
   | ☐ Bankruptcy Proof of Claim (remove from receivables and place in bankruptcy file) | |
   | ☐ Other: | |

RJH/lg

cc: President
Vice President of Operations
Managing Director
Treasurer
Credit Analyst
Administrative Manager
Job File

Form 129 – 05/28/2003

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

1

2
                                    )    Docket No. 04 C 6018
3    GEORGE S. MAY,                 )
                                    )
4                                   )
                                    )
5               Plaintiff,          )
                                    )    Chicago, Illinois
6          -vs-                     )    June 9, 2005
                                    )    10:30 o'clock a.m.
7    ECCENTRIC VENTURES, LLC,       )
                                    )
8               Defendant.          )
                                    )
9

10

11        BEFORE THE HONORABLE CHARLES R. NORGLE-MOTION

12   APPEARANCES:

13   For the Plaintiff:    SEYFARTH, SHAW
                           55 East Monroe, 42nd Floor
14                         Chicago, Illinois  60603
                           BY:  MR. BART A. LAZAR
15                              MS. RACHEL KINDSTRAND

16   For the Defendant:    TRESSLER, SODERSTROM, MALONEY and
                           PRIESS,
17                         233 South Wacker Drive, 22nd Floor
                           Chicago, Illinois 60606
18                         BY:  MR. DAVID O. YUEN

19

20

21              RAYMOND F. PETERS
           Official Contract Court Reporter
22              19765 Cambridge Drive
              Mokena, Illinois  60448
23                 (312) 446-6446

24

25

21

1          THE COURT:  Well, how many does it take to do business
2     in Illinois?

3          MR. YUEN:  How many customers would it take?

4          THE COURT:  Yes.

5          MR. YUEN:  Probably one.

6          THE COURT:  At least one big one, maybe.

7          MR. YUEN:  Yes.

8          THE COURT:  All right.  You may proceed with your
9     argument.

10         MR. YUEN:  Basically, that is the crux of our
11    argument, that we don't need to disclose financial information
12    and identity of our customers.  We have a duty to protect their
13    privacy and confidential information.

14         THE COURT:  But this is based upon your assumption or
15    something not certainly in evidence yet, that your customers
16    are the same customers as Pay Pal or that somehow you share
17    these individuals or entities as customers.

18         MR. YUEN:  Well, I am not certainly not saying that we
19    share every customer that Pay Pal has but the subpoena seeks
20    information related to transactions between Pay Pal and the
21    defendant.

22         THE COURT:  Okay.  But you have not or are not about
23    to enter an order to identify any one person or entity?

24         MR. YUEN:  Correct.

25         THE COURT:  So what is your reply?