EXHIBIT J

LEXSEE 2006 US DIST LEXIS 47233


Analysis
As of: Jan 05, 2007

**MERIX PHARMACEUTICAL CORPORATION, v. GLAXOSMITHKLINE CONSUMER HEALTHCARE, L.P., AND SMITHKLINE BEECHAM COPORATION.**

No. 5 C 1403

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2006 U.S. Dist. LEXIS 47233; 2006-2 Trade Cas. (CCH) P75,352*

June 28, 2006, Decided
June 28, 2006, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Merix Pharm. Corp. v. Glaxosmithkline Consumer Healthcare, L.P. & Smithkline Beecham Corp., 2006 U.S. Dist. LEXIS 77388 (N.D. Ill., Oct. 11, 2006)*

**COUNSEL:** [*1] For Merix Pharmaceutical Corp., Plaintiff: Ronald Y Rothstein, Jeffrey A. Leon, Kimball Richard Anderson, Stephen P. Durchslag, Vishal Raj Sahni, Winston & Strawn, Chicago, IL.

Annette Scott, Plaintiff, Pro se.

For Glaxosmithkline Consumer Healthcare, L.P., Defendant: Christina M. Tchen, Justin Lee Heather, Skadden Arps Slate Meagher & Flom, LLP, Chicago, IL.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINION BY:** Wayne R. Andersen

**OPINION:**

**MEMORANDUM, OPINION AND ORDER**

**Wayne R. Andersen**

**District Judge**

In February 2005, GlaxoSmithKline Consumer Healthcare, L.P. ("GSK") filed suit in New Jersey federal court against Merix Pharmaceutical Corp. ("Merix") challenging the advertising of ViraMedx RELEEV, an over-the-counter ("OTC") cold sore drug manufactured and marketed by Merix. Approximately one month later, Merix filed suit in this Court against GSK, challenging the advertising for Abreva, an OTC cold sore drug marketed by GSK, and Valtrex, a prescription medication used to treat cold sores, genital herpes, and shingles, both of which compete with RELEEV. Merix claims GSK's advertising of Abreva and Valtrex violates (i) the Illinois Consumer Fraud and Deceptive [*2] Business Practice Act, *815 ILCS 505/1, et seq.* (the "ICFA"); (ii) the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS 510/1, et seq.* (the "IDTPA"); (iii) the federal Lanham Act; and (iv) Illinois common law. With respect to Valtrex, Merix contends that GSK's statements that the drug is a "One-Day Cold-Sore Treatment" for cold sores and "3-Day Outbreak Therapy" for genital herpes on the internet, in print, press releases and television advertising are false and misleading and therefore in violation of the ICFA, IDTPA, Lanham Act and Illinois common law. The advertising is alleged to have occurred within the Northern District of Illinois.

The Food and Drug Administration ("FDA") approved Valtrex in 1995 pursuant to a New Drug Application. The FDA directed that "patients should be instructed that treatment for cold sores should not exceed 1 day (2 doses)." With respect to genital herpes, the FDA approved a recommended dosage of "500 mg twice daily for 3 days" for the treatment of recurrent episodes and "1 gram twice daily for 10 days" for the treatment of initial episodes.

Case 1:04-cv-06018    Document 234-11    Filed 01/05/2007    Page 3 of 15

Page 2
2006 U.S. Dist. LEXIS 47233, *; 2006-2 Trade Cas. (CCH) P75,352

Merix characterizes GSK's statements that [*3] Valtrex is a "One-Day Cold-Sore Treatment" for cold sores and "3-Day Outbreak Therapy" for genital herpes as a "campaign of deception regarding the efficacy of its drugs and unscientific conclusions based on unreliable test data." GSK contends its advertising does no more than repeat what the FDA requires it to inform patients who take, and doctors who prescribe, Valtrex. Merix points to studies evidencing that GSK's "One-Day Cold Sore Treatment" and "3-Day Outbreak Therapy" are false and misleading statements and thus violate the ICFA, IDTPA, Lanham Act and Illinois common law. It claims the statements "influence purchasing decisions and mislead unwitting doctors into recommending and prescribing" the drug. Merix claims these practices divert sales away from Merix to GSK and, as a result, it is entitled to an injunction, damages, an accounting of GSK's profits on Valtrex sales, and attorneys' fees.

### Standard of Review

A motion for judgment on the pleadings pursuant to *Rule 12(c)* is reviewed under the same standard that applies to dismissals under *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted. See *R. J. Corman Derailment Servs., L.L.C. v. Int'l Union, Local Union 150, 335 F.3d 643, 647 (7th Cir. 2003)*. [*4] A motion for judgment on the pleadings should be granted "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomas v. Guardsmark, Inc., 381 F.3d 701, 704 (7th Cir. 2004)*. This Court must accept all well-pleaded allegations as true, drawing all reasonable inferences from those facts in the Plaintiff's favor. *Id.*

### Rule 9(b)

Each of Plaintiff's claims, though framed under distinct legal theories, all emanate from the same factual allegations -- that the Defendant committed consumer fraud by disseminating false and misleading advertising. Claims alleging consumer fraud under the ICFA and Lanham Act must be plead with particularity under *Fed. R. Civ. P. 9(b)*. See *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F.Supp. 1241, 1243-44 (N.D. Ill. 1994)* To meet this heightened standard, a plaintiff alleging fraudulent misconduct must state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)*. [*5] When the alleged fraud occurred over a period of time, the Rule's pleading requirements -- including the "time" requirement -- apply less stringently. *Mutuelle Generale Francaise Vie v. Life Insurance Co. of Pennsylvania, 688 F. Supp. 386, 393 (N.D. Ill. 1988)*. The plaintiff does not have to allege evidentiary details, rather, it is only required to "set forth the basic outline of the scheme, who made what representations and the general time and place of such misrepresentations [illegal text]" *Mutuelle Generale Francaise Vie*, 688 F. Supp. At 393. In fact, the "identity" requirement is met when a plaintiff pleads only the entity making the statement, the place requirement is satisfied by a general statement setting forth that the statements were made in all fifty states, the content requirement only mandates that the plaintiff mention the type and nature of the misleading statements, and the "method" requirement is reached by pleading the type of advertising in which the statements appeared. *Hot Wax v. Grace-Lee Prods., 1998 U.S. Dist. LEXIS 14952, No. 97 C 6882 (N.D. Ill. Sept. 15, 1998), 1998 WL 664945*.

Based on these considerations, this Court [*6] finds that Merix has met the *Rule 9(b)* particularity requirements. First, Merix identifies the entity making the alleged misrepresentations -- Defendant GSK-thereby satisfying the "identity" requirement. Second, Merix satisfies the "time" requirement by asserting that GSK is making the alleged misrepresentations on an ongoing basis. Third, Merix asserts GSK committed the alleged fraudulent activity in the Northern District of Illinois and therefore satisfies the "place" requirement. Fourth, the complaint fulfills the "content" requirement by identifying the "One-Day Cold-Sore Treatment" and "3-Day Outbreak Therapy" statements about Valtrex as the false and misleading advertising claims. Fifth, the complaint alleges that GSK marketed its products through "the internet, in print, press releases, point-of-purchase and television advertising," thereby satisfying the method requirement. For the reasons above, this Court denies GSK's motion with respect to *Rule 9(b)* pleading requirements.

### ICFA Claims

The ICFA prohibits unfair methods of competition, including the use of false or misleading information in the conduct of commerce with intent that others rely upon the information. [*7] *815 Ill. Comp. Stat. 505/2*. To establish a violation of the ICFA's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving trade or commerce. *Zekman v. Direct Am. Marketers, Inc., 182 Ill. 2d 359, 695 N.E.2d 853, 860, 231 Ill. Dec. 80 (Ill. 1998)*; *Siegel v. Levy Org. Dev. Co., 153 Ill. 2d 534, 607 N.E.2d 194, 198, 180 Ill. Dec. 300 (Ill. 1992)*. If the alleged deceptive practice implicates consumer protection concerns, a defendant's competitor may bring an ICFA claim. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F. Supp. 1241 (N.D. Ill. 1994)*. Under the ICFA, a statement is

Case 1:04-cv-06018   Document 234-11   Filed 01/05/2007   Page 4 of 15

Page 3
2006 U.S. Dist. LEXIS 47233, *; 2006-2 Trade Cas. (CCH) P75,352

deceptive if it creates a likelihood of deception or has the capacity to deceive. *People ex rel. Hartigan v. Knecht Servs., Inc., 216 Ill. App. 3d 843, 575 N.E.2d 1378, 1387, 159 Ill. Dec. 318 (Ill. App. Ct. 1991)*; see also *Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 938 (7th Cir. 2001)*. [*8] When determining whether a statement has the capacity to deceive, courts should examine the statement in the context of other information available to consumers. See *Bober, 246 F.3d at 940*.

GSK seeks dismissal under an ICFA section explicitly setting forth that no conduct specifically authorized by any regulatory body of Illinois or the United States of America can create liability under the statute. *815 ILCS 505/10b(1)*. The Seventh Circuit has explained that this section ensures that the ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations." *Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 941 (7th Cir. 2001)*. At the same time, the "exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate." *Id.*

Many of Merix's allegations concerning Valtrex are lifted from the Prescribing and Patient Information. Merix argues that the dosage recommendations, clinical study data and notifications made in [*9] the information sheets prove that GSK is disseminating broad, baseless statements to "unwitting consumers and health care professionals." The Prescribing and Patient Information, however, are also the genesis for the statements GSK made in its advertising campaign for Valtrex.

Judge Zagel noted in a nearly identical context concerning a class action pending against GSK, "there is not enough information in the complaint to state definitively that GSK's statements are labeling that is specifically authorized by the FDA . . . It may [] be possible for GSX to show that the marketing was almost identical to the specifically authorized labeling, but at this point, there is no evidence to decide one way or the other" *Scott v. GlaxoSmithKline Consumer Healthcare, L.P., 2006 U.S. Dist. LEXIS 18630, No. 05 C 3005 (N.D. Ill. April 12, 2006)*. We agree that, at this point, there is insufficient information for us to determine whether the Valtrex advertising campaign falls under the purview of the ICFA exemption for statements authorized by the FDA. Accordingly, GSK's motion is denied as to the ICFA claims.

**Lanham Act & Common Law Claims**

GSK asks us to dismiss the Lanham Act claims because "there [*10] is no private right of action under the Federal Food, Drug, and Cosmetics Act, *21 U.S.C. § § 321, et seq.*, [("FDA Act")] and therefore a private party has no standing to challenge whether a competitor has properly obtained FDA approval, or to look behind the FDA's approval and question whether the FDA acted properly." However, Merix's Complaint does not seek to assert a private right of action under the FDA Act. Instead, Merix argues that GSK's statements are literally false, and hence actionable under Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*. Courts routinely allow this type of claim to go forward, regardless of whether or the allegedly false statements are within the purview of the FDA. *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc., 720 F.Supp. 714, 716 (N.D.Ill. 1989)* ("The fact that [plaintiff] refers to or relies on an FDA regulation defining orange juice to support its Lanham Act claim is not grounds for dismissal.)

GSK also asks us to dismiss the IDTPA claim because that statute is "merely a codification of the Illinois common law of unfair competition." However, we have allowed the [*11] ICFA claim to proceed. Merix pleaded a claim that falls within the IDTPA and the Illinois common law of unfair competition.

**Conclusion**

For the above stated reasons, Merix's motion to dismiss the Valtrex claims [38] is denied.

It is so ordered.

Wayne R. Andersen

United States District Court

Dated: June 28, 2006

LEXSEE 2006 US DIST LEXIS 82971

INTERNATIONAL PROFIT ASSOCIATES, INC., an Illinois Corporation, Plaintiff, v. ROBERT PAISOLA (a/k/a Robert H. Paisola, Jared Rob Deheart and Robert Deheart), Individually, et al., and ROBERT PAISOLA, TRADING AS WESTERN CAPITAL FINANCIAL SERVICES, INC. (a/k/a The Western Capital Financial Group and/or The Western Capital Family of Companies). Defendants.

No. 06 C 6154

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2006 U.S. Dist. LEXIS 82971*

November 14, 2006, Decided

**COUNSEL:** [*1] For International Profit Associates, Inc., an Illinois Corporation, Plaintiff: Ronald Lee Bell, LEAD ATTORNEY, Ronald L. Bell & Associates, Buffalo Grove, IL; Daniel J. Becka, Jacie C Zolna, Myron Milton Cherry, Myron M. Cherry & Associates, Chicago, IL.

**JUDGES:** Elaine E. Bucklo, United States District Judge.

**OPINION BY:** Elaine E. Bucklo

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff International Profit Associates ("IPA") has brought a multi-count complaint against defendant Robert Paisola ("Paisola"), both individually and trading as Western Capital Financial Services, Inc. ("Western Capital") (collectively "defendants"), bringing claims for extortion; violation of the Federal Racketeering and Corrupt Organizations Act, *18 U.S.C. § 1961, et seq. (2006)* ("RICO"); violation of the Illinois state statute prohibiting eavesdropping, *720 ILL. COMP. STAT. ANN. 5/14-1, et seq.*; civil conspiracy; defamation; tortious interference with contract; tortious interference with prospective economic gain, conspiracy to injure in trade, business and reputation; violation of the Lanham Act, *15 U.S.C. § 1114*; "cyberpiracy" under [*2] *15 U.S.C. § 1125(d)*; and violation of the Illinois Deceptive Trade Practices Act, *815 ILL. COMP. STAT. ANN. 510/2*. IPA has now brought a motion for a temporary restraining order ("TRO") against defendants, prohibiting them from communicating with IPA's present and past officers and employers, using certain websites, possessing computers with online computer service, conducting internet advertising, publishing press releases about IPA, and using IPA's trademarks. I have heard IPA's arguments in support of its proposed TRO. IPA also presented an affidavit from its counsel stating that IPA has been unable to give defendants notice because it is unsure of Paisola's location, and because Western Capital is an unincorporated company. I grant IPA's motion for a TRO, but issue a more limited TRO than the one IPA seeks.

I. Background

In support of its motion for a temporary restraining order, IPA established the following: IPA is an Illinois corporation that provides business consulting services to other corporations. IPA has logos and trademarks associated with its business. IPA also maintains the website www.ipaopinions.com.

Somehow, [*3] some of IPA's "disputes" with former customers came to the attention of Paisola and the company with which he is associated, Western Capital. Paisola subsequently began publishing allegations and information about IPA on two websites that Paisola operates, www.collectionindustrylive.com and www.ipaopinion.com. Paisola also made telephone calls to certain IPA employees and agents, and, without their knowledge or consent, taped those calls and made transcripts and recordings available on his websites. Paisola also included logos, trademarks, and copyrighted material of IPA on his websites. Further, Paisola has published false or misleading information about IPA on his websites, including the insinuation that IPA offered him ten million dollars to resolve his complaints against it, and the insinuation that IPA offered to allow Paisola to

Case 1:04-cv-06018    Document 234-11    Filed 01/05/2007    Page 6 of 15

Page 2
2006 U.S. Dist. LEXIS 82971, *

take part in the governance of IPA. In addition, IPA has presented information that Paisola has used IPA's trademarked term "International Profit Associates" as part of the text of an advertisement through Google's "Adwords" program n1 so that Google users searching on Google's website for "International Profit Associates" see Paisola's website at the [*4] top of their search results.

n1 Google offers a service in which its customers may arrange for their advertisements to appear on Google's website in response to a user's search query (for example, a user of Google's website who enters a search for "books" might receive search results that include advertisements for booksellers). Google calls its advertising program "Adwords." Google's customers may select certain search terms that, if entered by a user, will return search results that include a section at the beginning of the user's search results titled "Sponsored Links." The "Sponsored Links" section lists the customer's website and a limited amount of advertising text. A search on Google's website using the search term "international profit associates" returns a list of search terms as well as three results in the "Sponsored Links" section. The third "sponsored link" includes the text "National Profit Ripoff" and directs the user to the website www.ipaopinion.com.

IPA has further shown that Paisola purports [*5] to represent a former customer of IPA with whom IPA has a collection dispute. Paisola has made escalating demands to IPA employees and agents to settle this dispute, beginning with an offer of $ 56,000 to resolve the matter, then raising his demand to $ 112,000. After IPA did not agree to these demands, Paisola began publishing on his websites some personal information about IPA management, including their home addresses.

IPA has provided affidavits asserting that as a result of Paisola's actions, the managing director of IPA, John Burgess, fears for his safety and the safety of his family; that other IPA employees have also feared for their safety; and that IPA has suffered "incalculable damages on a daily basis to its good name and reputation, has lost employees and potential employees, and has lost business with current and potential clients."

IPA's complaint in this matter followed.

II. Legal Standard

To obtain its desired temporary restraining order, IPA must show that (1) it is reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent [*6] will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. See *Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613, 619 (7th Cir. 2004); Long v. Bd. of Educ., Dist. 128, *167 F. Supp. 2d. 988, 990 (N.D. Ill. 2001)* ("The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions."). IPA has the burden of proof to make a clear showing that it is entitled to the relief it seeks. See *Goodman v. Illinois Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (internal citations omitted).

In order to receive a temporary restraining order without providing notice to the defendants, IPA must show that irreparable injury will result "before the adverse party or that party's attorney can be heard in opposition," and must certify in writing "the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." FED. R. CIV. P. 65(b). Here, IPA appeared in court without giving notice to defendants of its motion. n2 Although it initially contended [*7] that it need not give Paisola notice because that "would allow Paisola additional time to continue to cause immediate and irreparable injury in his racketeering and extortion plot against [IPA]," IPA's attorney has now clarified that although IPA's investigator briefly located Paisola in Utah on Friday, November 10, 2006, the investigator has not been able to locate him since, and therefore IPA has not had an opportunity to give Paisola notice. Because IPA has represented that it has not been able to provide Paisola notice, I will grant IPA an ex parte TRO. See *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (finding that the district court erred in granting an ex parte temporary restraining order because "there was no valid reason for proceeding ex parte").

n2 IPA contends, and there appears evidence to support, that Western Capital is not an incorporated company and therefore cannot be noticed (although in its complaint IPA provides an address that it alleges is Western Capital's principal place of business). Furthermore, it appears that Western Capital is entirely in the control of Paisola, so Paisola is likely the only real party at interest in this litigation.

[*8]

III. Reasonable Likelihood of Success on the Merits

To show a reasonable likelihood of success on the merits, IPA need only show "some likelihood of success" and that its "chances are better than negligible." See *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015

Case 1:04-cv-06018   Document 234-11   Filed 01/05/2007   Page 7 of 15

Page 3
2006 U.S. Dist. LEXIS 82971, *

*(7th Cir. 1990)* (internal citations omitted). Here, IPA has made this showing at least with respect to some of its claims. However, IPA's memorandum in support of its motion is scant in its argument that it has shown a likelihood of success; it simply contends that "there can be little doubt that IPA will prevail on some, if not all, of its causes of actions" without setting forth the elements of each of these claims and showing how IPA would meet each of those elements. This court will not do IPA's work for it and analyze the law governing each of IPA's claims, but does find that IPA has shown a likelihood of success on at least some of its claims.

   a. IPA's claims under the Lanham Act

IPA's key claim against Paisola is that Paisola is violating the Lanham Act by incorporating IPA's trademarks into the search terms used to lead people to his website, by using those trademarks in the domain name of one of [*9] his websites, and by using IPA's trademarks in the content of his websites. To show that it has a reasonable likelihood of success on its Lanham Act claim that defendants' domain name is confusingly similar to its trademarks, IPA must show that it has trademarks protected by the Lanham Act and that the defendants' domain name is likely to cause confusion among consumers. See *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043 (7th Cir. 2000). Similarly, to show a likelihood of success on its claim that defendants are using its trademarked terms, IPA must show that it has registered its marks, the defendants used the marks without its consent, and that the unauthorized use is likely to confuse consumers or deceive the public. See *15 U.S.C. § 1114(1)(a)*. Here, IPA has made such a showing. It has established through affidavits and attached materials that defendants are using terms trademarked by IPA as search terms in Google's Adwords program in a manner likely to cause confusion, n3 and that Paisola has established a domain name for one of his websites, www.ipaopinion.com, that is confusingly similar to IPA's trademark. See, e.g., *Morrison & Foerster LLP v. Wick*, 94 F. Supp.2d 1125, 1130 (D. Colo. 2000) [*10] (finding, where law firm had trademarked name "Morrison & Foerster" and had established website www.mofo.com, websites such as www.morrisonfoerster.com and www.morrisonandfoerster.com were identical or confusingly similar to law firm's mark). n4 Therefore, IPA has established a likelihood of success on its Lanham Act claim.

---

   n3 The law in the Seventh Circuit is silent on whether the use of a trademark as a keyword in an online search program such as Google's Adwords is a use "in commerce" under the Lanham Act as required to establish a claim, but other courts have determined that purchasing a trademarked term as a "keyword" for Google Adwords program meets the Lanham Act's use requirement. See *Buying for the Home, LLC v. Humble Abode, LLC*, No. 03-cv-2783, 2006 U.S. Dist. LEXIS 76371, 2006 WL 3000459, at *7-8 (D. N.J. Oct. 20, 2006) (collecting cases).

   n4 IPA makes much of the fact that defendants' website www.ipaopinion.com is substantially similar to its website www.ipaopinions.com, but as the court noted in *Brookfield Communications., Inc. v. West Coast Entertm't Corp.*, 174 F.3d 1036 (9th Cir. 1999), this does not matter since the important confusion for Lanham Act purposes is confusion with a trademarked term (here, "IPA" and not "ipaopinions.com." See *id.* at 1055. IPA does not allege that it has trademarked "ipaopinions." This similarity is relevant only for IPA's "cyberpiracy" claim.

---

[*11]

   b. IPA's "cyberpiracy" claim

Relatedly, IPA has also shown a likelihood of success on its "cyberpiracy" or "cybersquatting" claim. n5 Under *15 U.S.C. § 1125(d)*, a party commits cybersquatting when (1) defendants have registered, trafficked in, or used a domain name; (2) the domain name is identical to or confusingly similar to marks owned by plaintiff; (3) the marks were distinctive at the time of defendants' registration of the domain name; and (4) defendants have committed the acts with a bad faith intent to profit from plaintiff's marks. See *Rosati's Franchise Sys., Inc. v. Rosati*, No. 05 C 3146, 2006 U.S. Dist. LEXIS 1837, 2006 WL 163145, at *5 (N.D. Ill. Jan. 17, 2006) (citing *15 U.S.C. § 1125(d)(1)*). "Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Id. (citing *15 U.S.C. § 1125(d)(1)(B)(ii)*). Here, IPA has shown that defendants registered www.ipaopinions.com after IPA established its own website, www.ipaopinion.com, and has sufficiently shown that defendants [*12] did this with the intent to profit from the confusion. Defendants may ultimately be able to show that they did not act in bad faith, but IPA has established a reasonable likelihood that this is the case.

---

   n5 Although IPA refers to this claim as a "cyberpiracy" claim, courts addressing *15 U.S.C.*

§ 1125(d) have referred to this section as a "cybersquatting" provision.

c. IPA's claim under the Illinois eavesdropping statute

IPA has also established a likelihood of success of its claim under the Illinois eavesdropping statute. A person commits eavesdropping under the statute when he, without some law enforcement justification, "[k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation . . . unless he does so . . . with the consent of all of the parties to such conversation." 720 ILL. COMP. STAT. ANN. 5/14-2(a). n6 IPA has shown that Paisola has taped conversations with IPA agents and [*13] employees without their consent and has published those tapes on his website. n7

   n6 This statute was amended in 1994 after the Illinois Supreme Courts' decision in *People v. Harrington*, 163 Ill.2d 507, 206 Ill. Dec. 705, 645 N.E.2d 957 (1994) that there is no violation of the statute where a conversation is recorded by one party to the conversation. Although the Supreme Court has not ruled on the efficacy of this updated statute, there are no cases rejecting the statute's clear language that a party commits eavesdropping when all parties to a conversation have not consented to its recording.

   n7 Under Illinois law, when communications with individuals acting as agents or representatives of a company are taped in violation of the Illinois eavesdropping statute, claims under the eavesdropping statute belong to the company. See *McDonald's Corp. v. Levine*, 108 Ill. App.3d 732, 743, 64 Ill. Dec. 224, 232, 439 N.E.2d 475, 483 (Ill. App. Ct. 1983).

d. IPA's defamation claim

Finally, IPA [*14] has shown a likelihood of success on at least a portion of its defamation claim. To establish a claim for defamation under Illinois law, IPA must show that the defendants made a false statement about it, the defendants made an unprivileged publication to a third party, and the publication of the statement damaged IPA. See *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006) (citing *Popko v. Cont'l Cas. Co.*, 355 Ill. App.3d 257, 261, 291 Ill. Dec. 174, 178, 823 N.E.2d 184, 188 (Ill. App. Ct. 2005)). Here, although IPA alleges that many statements that defendants made about IPA and published on their websites were false, IPA has only provided affidavits demonstrating that certain of those statements were false (although ultimately IPA may well be able to show that many others were false as well). IPA has at least shown that defendants insinuated that IPA offered Paisola ten million dollars to resolve his complaints, and insinuated that IPA offered to allow Paisola to take part in the governance of IPA. IPA has also shown a likelihood that the publication of this false statement damaged it.

e. IPA's other claims

IPA has brought other claims against [*15] defendants, including claims under RICO; civil conspiracy; tortious interference with contract; tortious interference with prospective economic gain; conspiracy to injure in trade, business and reputation; extortion; and violation of the Illinois Deceptive Trade Practices Act. IPA has not presented specific argument about how it has a likelihood of success on these claims, instead only generally arguing that it has shown a likelihood of success on its claims generally, and it has not attempted to set forth specific facts in support of these claims. n8 Therefore, I cannot base a TRO on the likelihood of success of any of these claims.

   n8 IPA does repeatedly contend that Paisola is extorting it by demanding money in exchange for ceasing his complaints and action against IPA. However, IPA has not articulated under what theory of extortion it is proceeding. IPA cannot simply cry "extortion" without setting forth an argument, both legal and factual, in support of its claim.

IV. Adequacy of Remedy at Law/Irreparable [*16] Harm

IPA must also show that it has no adequate remedy at law and that it would suffer irreparable harm that would outweigh any irreparable harm to defendants if the TRO were granted. IPA has shown that Paisola's infringement of its trademarks will lead to incalculable loss of its reputation with its customers. As other courts have noted with respect to claims for trademark infringement under the Lanham Act, because it is difficult to assess damages associated with loss of goodwill, such damages are considered to have no adequate remedy at law, and to be irreparable. See, e.g., *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994). The same is true for Paisola's claim for cybersquatting, since this claims raise the same problem of quantifying damages. I further find, with respect to IPA's trademark claims, that the irrepara-

Case 1:04-cv-06018   Document 234-11   Filed 01/05/2007   Page 9 of 15

Page 5
2006 U.S. Dist. LEXIS 82971, *

ble harm that IPA will suffer if this injunction is not granted far outweighs any harm that defendants will suffer, since defendants are free to engage in speech concerning IPA in other lawful ways without cybersquatting [*17] or using IPA's trademarks. And, I find that an injunction on IPA's trademark claims will not harm the public interest.

I am not convinced that an injunction is appropriate for IPA's defamation claims, except for IPA's demonstration that defendants include false information on their website purporting to show that IPA offered to settle with it and to allow Paisola to participate in the management of the company. As the Supreme Court has noted, "Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the *First Amendment* context." *CBS, Inc. v. Davis, 510 U.S. 1315, 1318, 114 S. Ct. 912, 127 L. Ed. 2d 358 (1994)* (Justice Blackmun, acting as Circuit Justice, staying preliminary injunction temporarily preventing broadcaster from broadcasting footage purportedly filmed while broadcaster was trespassing on company's property); see also *Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976)* ("The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on *First Amendment* rights. A criminal penalty or a judgment [*18] in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative."). IPA nevertheless contends, citing *Huskey v. Nat'l Broad. Co, Inc., 632 F. Supp. 1282 (N.D. Ill. 1986)*, that injunctive relief is appropriate to prevent against defendants' "smear campaign" against plaintiff. In Huskey, the district court held that injunctive relief to prevent a private harm (in that case, broadcasting footage of a prisoner that invaded his privacy) was not necessarily improper. *Id. at 1295*. Importantly, the court stated that its denial of defendant's motion to dismiss the plaintiff's prayer for injunctive relief "should not be misunderstood as a decision confirming the actual availability of injunctive relief here." *Id. at 1296*.

Here, while an outright ban prohibiting defendants from engaging in certain speech is unwarranted and potentially a prior restraint on speech, it does not violate the principles of the *First Amendment* to enjoin defendants [*19] from continuing to include certain information on their website that is, on the record before the Court, demonstrably false and defamatory, and that IPA has shown will cause it irreparable harm and against which it has no adequate remedy at law. I find that the only in-

stance of defamation against which defendants may be enjoined at this stage of the litigation is defendants' false representation that IPA offered to settle with Paisola, and that as part of this settlement IPA agreed to pay Paisola and to allow Paisola to participate in the management of the company. I do find that IPA has no adequate legal remedy as to this demonstrated defamation, and that the damages of this defamation, including reputational losses and potential confusion by its customers and employees, are incalculable such that IPA has no adequate legal remedy. I further find that a TRO prohibiting defendants from continuing to publish this false statement is not against the public interest, and that any incidental harm to defendants in prohibiting further publication would be far outweighed by the damage to IPA of its continued publication.

I cannot conclude that a TRO is appropriate on IPA's eavesdropping statute [*20] claim. Because the Illinois eavesdropping statute provides for injunctive relief, see *720 ILL. COMP. STAT. ANN. 5/14-6(1)(a)*, irreparable harm may be presumed. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n, 740 F.2d 566, 571 (7th Cir. 1984)* (irreparable harm may be presumed where claim brought under federal statute providing for injunctive relief). However, IPA must still show that any legal remedy it could ultimately obtain would be inadequate. See *Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 386 (7th Cir. 1984)*. I find that IPA has not shown that damages would not compensate it for any eavesdropping in which IPA is engaging. Although IPA understandably does not want conversations with its employees and agents recorded and made public, and without condoning defendants' apparent disregard for the law concerning eavesdropping, IPA has not shown, or even directly argued, that damages for this eavesdropping cannot be calculated. This is particularly true where the conversations are of a business nature and do not reveal anything personal about the participants themselves, or anything of a private or confidential nature [*21] concerning IPA. While IPA ultimately may be entitled to injunctive relief prohibiting defendants from engaging in further eavesdropping, IPA has not shown that the legal remedies to which it is also entitled would not be adequate.

V. Scope of Temporary Restraining Order

Having concluded that IPA is entitled to a temporary restraining order on its Lanham Act and cybersquatting claims, and to a limited extent on its defamation claim, I must now determine the proper scope of such a TRO. IPA has sought a TRO that is inappropriately broad; it asks me to temporarily enjoin defendants from such activities such as communicating with IPA's present and past officers and employees, making any statements "concerning or related to IPA, its officers, and its employees," using computers with access to any online

computer services, possessing data encryption techniques or programs, and publishing any information about IPA. There is no basis for affording IPA any of this extraordinary relief. However, IPA is entitled to some relief.

Therefore, I hereby order defendants to (1) cease making content available on the internet through the domain name www.ipaopinion.com; (2) cease conducting further advertising **[*22]** using terms trademarked by IPA, including the terms "International Profit Associates," "IPA" or "IBA"; (3) cease using terms trademarked by IPA, including the terms "International Profit Associates," "IPA" or "IBA", as keywords for any internet advertising service, including services run by Google or Yahoo; and (4) remove from their websites any false assertions that IPA or anyone associated with IPA has offered to settle with defendants or has offered to allow defendants to participate in the management of IPA.

This TRO shall apply to the parties to this action as well as their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. This TRO shall expire ten days from the date of its entry. In addition, plaintiff shall be required to post a bond of $ 10,000 in order for this TRO to take effect.

**Elaine E. Bucklo**

United States District Judge

Dated: November 14, 2006

LEXSEE 1998 US DIST LEXIS 1471


Analysis
As of: Dec 31, 2006

**EUCLID INSURANCE AGENCIES, INC., Plaintiff, v. AMERICAN ASSOCIATION OF ORTHODONTISTS, Defendant, v. SCOTTSDALE INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, and MERIDIAN GENERAL AGENCY, INC., Counterclaim Defendants.**

No. 95 C 3308

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1998 U.S. Dist. LEXIS 1471*

February 4, 1998, Decided
February 5, 1998, Docketed

**DISPOSITION:** [*1] Counterclaim defendants' motion for summary judgment on Counts III, IV, and V denied.

**COUNSEL:** For EUCLID INSURANCE AGENCIES, INC., plaintiff: William William Yotis, III, Berman & Yotis, Chicago, IL.

For EUCLID INSURANCE AGENCIES, INC., plaintiff: Eric D. Kaplan, Dean James Papadakis, Kaplan & Papadakis, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, defendant: Gabrielle Sigel, Jenner & Block, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, defendant: Kenton E Knickmeyer, Bradley A Winters, Suzanne Gau, Thompson Coburn, St. Louis, MO.

For MERIDIAN GENERAL AGENCY, INC., NATIONAL CASUALTY COMPANY, counter-claimants: Richard R. Winter, Naomi R. Angel, McBride, Baker & Coles, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, counter-claimant: Gabrielle Sigel, Jenner & Block, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, counter-claimant: Kenton E Knickmeyer, Bradley A Winters, Suzanne Gau, Thompson Coburn, St. Louis, MO.

For SCOTTSDALE INSURANCE COMPANY, counter-defendant: Jonathan Edward Strouse, Richard R. Winter, Naomi R. Angel, McBride, Baker & Coles, Chicago, IL.

For NATIONAL CASUALTY COMPANY, counter-defendant: Richard [*2] R. Winter, Naomi R. Angel, McBride, Baker & Coles, Chicago, IL.

For SCOTTSDALE INSURANCE COMPANY, counter-claimant: Jonathan Edward Strouse, Richard R. Winter, Naomi R. Angel, McBride, Baker & Coles, Chicago, IL.

For EUCLID INSURANCE AGENCIES, INC., counter-defendant: William William Yotis, III, Berman & Yotis, Chicago, IL.

For EUCLID INSURANCE AGENCIES, INC., counter-defendant: Eric D. Kaplan, Dean James Papadakis, Kaplan & Papadakis, Chicago, IL.

For MERIDIAN GENERAL AGENCY, INC., counter-defendant: Naomi R. Angel, McBride, Baker & Coles, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, counter-defendant: Gabrielle Sigel, Jenner & Block, Chicago, IL.

For AMERICAN ASSOCIATION OF ORTHODONTISTS, counter-defendant: Kenton E Knickmeyer, Bradley A Winters, Suzanne Gau, Thompson Coburn, St. Louis, MO.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINION BY:** Wayne R. Andersen

**OPINION:**

### MEMORANDUM ORDER AND OPINION

Counterclaim plaintiff, the American Association of Orthodontists (the "Association"), is a national organization acting on behalf of its members, licensed orthodontists. Pursuant to a February 1989 agreement (the "Agreement") with the [*3] Association, Scottsdale Insurance Company ("Scottsdale") sold professional liability insurance to Association members. This lawsuit arises out of that Agreement.

Counterclaim defendants, Scottsdale, National Casualty Company, Meridian General Agency, Inc. ("Meridian"), and Euclid Insurance Agencies, Inc. ("Euclid"), now move for partial summary judgment pursuant to Fed. R. Civ. P. 56 on Counts III, IV, and V of counterclaim plaintiff's complaint. For the reasons stated below, the motion for summary judgment is denied.

### BACKGROUND

The following facts, taken from the parties' 12M and 12N statements, are uncontested unless otherwise noted. The Agreement consisted of Scottsdale's letter to the Association and the Association's reply facsimile. Scottsdale's letter identified George Suprenant ("Suprenant") as Scottsdale's exclusive agent. As the agent, Suprenant would possess confidential statistical information and resolve underwriting matters and member complaints. The Agreement specified that Scottsdale would make rate adjustments over time based on experience and actuarial calculations. Either party could terminate the Agreement after May 1, 1991, if the other party was provided [*4] with 180 days notice.

Subsequently, Suprenant established Meridian, a corporation, to perform his tasks as Scottsdale's general agent. Meridian had no contact with Association members. Instead, the Association's retail group, Jardine Group Services, Inc. ("Jardine"), directly contacted Association members to purchase Scottsdale insurance. Jardine paid the Association a royalty for every policy sold to Association members.

During the pendency of the Agreement, the Association asked Scottsdale about reducing policy premiums. The Association also requested that Scottsdale provide accurate figures regarding Scottsdale's costs and profits from the Agreement. In 1992, the Association sought actuarial advice from a private consultant. The consultant's report indicated that Scottsdale's premium rates could be reduced.

On November 30, 1994, Euclid purchased Meridian's assets and replaced Meridian as Scottsdale's general agent for the professional liability insurance sold to Association members under the Agreement.

By May 1995, the Agreement ended. On May 31, 1995, the Association licensed the American Association of Orthodontists Insurance Company (the "AAOIC"). As the Association's captive [*5] insurance company, the AAOIC sold its own professional liability insurance to Association members. The Association received a royalty from every policy its members purchased from the AAOIC.

While the AAOIC was being licensed, Scottsdale experienced a decline in policy renewals from Association members. As a result, Euclid began soliciting Association members directly for the first time.

In 1996, the Association asked its members to assign to it any claims members might bring based on the Agreement. Consequently, 1,940 Association members who purchased insurance under the Agreement assigned claims to the Association.

On August 23, 1996, Euclid filed suit against the Association seeking declaratory and compensatory relief for violations of the Agreement. On September 17, 1996, the Association filed a five-count counterclaim complaint against counterclaim defendants. The Association alleges a violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 (Count I), breach of contract (Counts II and III) and violations of the Lanham Act, 15 U.S.C. § 1125(a) (Count IV), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (Count V). Counterclaim defendants now move for [*6] summary judgment on Counts III, IV and V.

Counterclaim defendants challenge the Association's standing to bring Counts III, IV and V. In addition, as to Count III, counterclaim defendants contend that the Association is estopped from bringing its breach of contract claim because it silently accepted the benefits from the Agreement. As to Counts IV and V, counterclaim defendants argue that their alleged offensive statements made in mailings to Association members are true and are not

actionable under the Lanham Act (Count IV) or the Illinois Uniform Deceptive Trade Practices Act (Count V).

## DISCUSSION

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Salima v. Scherwood S., Inc., 38 F.3d 929, 932 (7th Cir. 1994)*. A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [*7] *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

The moving party bears the burden of demonstrating that there is an absence of evidence to support the position of the nonmoving party. *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 442-43 (7th Cir. 1994)*. Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc., 27 F.3d 268, 270 (7th Cir. 1994)*, presenting only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Walker v. Shansky, 28 F.3d 666, 671 (7th Cir. 1994)*.

In making its determination, the Court's sole function is to decide "whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp., 24 F.3d 918 (7th Cir. 1994)*. Credibility determinations and weighing evidence are jury functions, not those of a judge when deciding a motion for summary judgment. *Anderson, 477 U.S. at 255*.

### I. Choice of Law

We begin with the choice of law issue. Count III is a breach of contract claim based on the Agreement which does not contain a choice of law provision. [*8] Neither party, however, disputes that Missouri law governs Count III. Moreover, neither party disputes that Illinois law governs Count V, a claim under the Illinois Uniform Deceptive Trade Practices Act. Thus, we conclude that Missouri law governs Count III and Illinois law governs Count V. Count IV, brought under the Lanham Act, is governed by federal law.

### II. Breach of Contract (Count III)

In Count III, the Association claims that Scottsdale breached the Agreement by charging excessive premium rates for the insurance Scottsdale sold to Association members. Counterclaim defendants argue that the Association lacks standing to pursue damage claims on behalf of its members because the members lack standing individually. Even if individual members have standing, counterclaim defendants contend that the Association itself lacks standing to bring Count III. Because most of the members assigned their claims to the Association, the Association contends that it is entitled to enforce the provisions of the Agreement on behalf of its members. We agree with the Association.

First, we must determine if Association members have standing individually. A third party beneficiary has "a right [*9] to maintain a cause of action for breach of contract even though [the party] never became privy to [the] contract nor to its consideration." *Ernst v. Ford Motor Co., 813 S.W.2d 910, 922 (Mo. Ct. App. 1991)*. The third party must show that, when the contracting parties entered into their agreement, they intended to benefit the third party. Id.

It is undisputed that the parties entered into the Agreement for the purpose of providing professional liability insurance to the Association's individual members. (Countercl. Pl. 12N Ex.7). Therefore, Association members are the intended beneficiaries of the Agreement and have standing individually to bring a claim under the Agreement. *Ernst, 813 S.W.2d 910 at 922*.

Moreover, once members of an association assign their individual claims to the association, the association is the proper party to bring those claims. See *Warth v. Seldin, 422 U.S. 490, 515, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)*; *International Woodworkers of Am., AFL-CIO, CLC v. Georgia-Pacific Corp., 568 F.2d 64, 66 (8th Cir. 1977)*. Furthermore, ". . . if an injured person assigns his right of action to someone else, the assignee has standing to enforce the [*10] right even though he is not the one who was injured by the defendant's wrongdoing." *National Ass'n of Realtors v. Nat'l Real Estate Ass'n, 894 F.2d 937, 941 (7th Cir. 1990)*. Here, 1,940 Association members assigned their claims against Scottsdale to the Association. (Countercl. Pl. 12 N Ex 26). Through these assignments, the Association has standing to pursue claims, such as Count III, on their member's behalf. See *National Ass'n of Realtors, 894 F.2d at 941*.

Second, counterclaim defendants contend that the Association silently accepted royalties from Scottsdale's alleged excessive premiums and, therefore, the Association is estopped from bringing its breach of contract claim. The Association argues that estoppel does not apply because it repeatedly complained to Scottsdale that its premium rates were excessive. We agree with the Association.

"Estoppel arises from the unfairness of permitting a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party

Case 1:04-cv-06018    Document 234-11    Filed 01/05/2007    Page 14 of 15

Page 4
1998 U.S. Dist. LEXIS 1471, *

had in good faith become disadvantaged by the changed conditions." *Blake v. Irwin*, 913 S.W.2d 923 (Mo. Ct. App. 1996). Because estoppel is an equitable defense, a [*11] court considering estoppel should examine the conduct of all parties. *Stenger v. Great S. Sav. and Loan Ass'n*, 677 S.W.2d 376, 383 (Mo. Ct. App. 1984).

Counterclaim defendants present no evidence to establish that they were "disadvantaged" by the Association's alleged failure to object to Scottsdale's premium rates. In any event, the Association's evidence, such as correspondence between the Association and Scottsdale, indicates that the Association complained to Scottsdale about its rates. (E.g. 12 N Ex. 12, Ex. 18, Ex. 28). Thus, Scottsdale had notice that the Association was not content with Scottsdale's premiums. The Association is not estopped from bringing its breach of contract claim.

Third, counterclaim defendants note that Scottsdale filed its insurances rates with 15 state regulatory agencies. Most states require insurance companies doing business in their state to register premium rates with the appropriate state agency. Under the filed rate doctrine, insurance rates approved by state regulatory agencies are "per se reasonable and are unassailable through judicial proceedings." *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d. Cir. 1994). Accordingly, counterclaim [*12] defendants argue that the filed rate doctrine precludes the Association from contesting Scottsdale's rates in the 15 states.

The filed rate doctrine, however, does not apply to bar Count III. In the Agreement, Scottsdale assented to make "adjustments . . . over time based on experience and actuarial calculations." (Countercl. Pl. 12 N Ex. 7). The Association is not challenging the reasonableness of Scottsdale's rates. Rather, the Association is claiming that Scottsdale failed to honor its contractual obligation to adjust rates based on experience and actuarial calculations. Although the reasonableness of Scottsdale's insurance rates and the fact that the rates were governed by regulatory agencies may be factors in deciding this issue, they are not dispositive. Furthermore, counterclaim defendants cite no statute or case which prohibited or limited Scottsdale's ability to fulfill its commitment. Therefore, a jury must decide if Scottsdale complied with the Agreement by appropriately adjusting rates. Counterclaim defendants motion for summary judgment is denied as to Count III.

### III. False Advertising in Violation of the Lanham Act (Count IV)

In Count IV, the Association claims [*13] that Scottsdale and Euclid committed false advertising in violation of the Lanham Act, *15 U.S.C. § 1125*. The Association alleges that Euclid's letters to Association members contained false statements about the insurance programs offered by the AAOIC and Scottsdale. Counterclaim defendants argue that the Association lacks standing to bring this claim because the Association does not sell or underwrite insurance and, therefore, did not suffer a discernible "competitive injury" as required by the Lanham Act. We agree with the Association.

To prove false advertisement under the Lanham Act, a plaintiff must show that he is damaged or is likely to be damaged by the defendant's false description or representation. *15 U.S.C. § 1125*(a). To establish liability, a plaintiff must prove that the challenged advertisement is literally false, or if literally true or ambiguous, that it is "misleading in context, as demonstrated by actual customer confusion." *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992). A plaintiff has standing if he demonstrates a "'reasonable interest to be protected' against activities that violate the [Lanham] Act." *Dovenmuehle v. Gilldorn Mortgage* [*14] *Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989) (quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)). Accordingly, a party whose royalty interest is adversely affected by a false or misleading statement has standing to bring a claim under the Lanham Act. See *PPX Enter. Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124-25 (2d Cir. 1984).

The Association receives a royalty for each policy Association members purchase from the AAOIC. The Association claims that Euclid's "false, disparaging, and deceptive" representations will deter Association members from purchasing insurance from the AAOIC. Thus, the Association argues that it lost royalties each time an Association member purchased a Scottsdale policy. This royalty interest allows the Association to assert the requisite competitive injury. *Id.* Therefore, the Association has standing to bring its claim under the Lanham Act.

Alternatively, counterclaim defendants contend that their alleged offensive statements are true and, thus, not actionable. To prove its Lanham Act claim, the Association must show that counterclaim defendants' statements are "inadequately substantiated" and that "the [*15] claims are literally false or misleading to the public." *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1089 (7th Cir. 1994).

In its counterclaim, the Association alleges that counterclaim defendants included six false, disparaging, and deceptive statements in mailings sent to individual Association members. (Countercl. Pl. Ans. and Counterclaim. p. 39-41). Counterclaim defendants admit that at least two of the statements in the Association's counterclaim complaint are "purely a question of semantics." (Countercl. Def. Mem. in Support of S. J. p. 15). The disposition of "questions of semantics" are precisely the types of factual disputes that cannot be decided on sum-

mary judgment. Moreover, the fact finder must decide if counterclaim defendants' statements convey a false impression or are misleading. *Abbot Lab., 971 F.2d at 13*. Therefore, the Association has raised issues of fact sufficient to defeat counterclaim defendants' motion for summary judgment on Count IV.

### IV. Violation of the Illinois Uniform Deceptive Trade Practices Act (Count V)

In Count V, the Association contends that Counterclaim defendants' alleged false representations violate the Illinois [*16] Uniform Deceptive Trade Practices Act, *815 ILCS 510/2*. Counterclaim defendants merely assert that the Association does not have standing "for the same reasons as Count IV." (Countercl. Def. Mem. in Support of S. J. p. 18.)

To bring a claim under the Illinois Uniform Deceptive Trade Practices Act, the plaintiff must show that the defendant unreasonably interfered with the conduct of the plaintiff's business. *Phillips v. Cox, 261 Ill. App. 3d 78, 81, 632 N.E.2d 668, 670, 198 Ill. Dec. 338 (Ill. App. Ct. 1994)*. A plaintiff may be granted relief whether or not his product or service is in direct competition with the defendant's product or service. *Thompson v. Spring-Green Lawn Care Corp., 126 Ill. App. 3d 99, 113, 466 N.E.2d 1004, 1015, 81 Ill. Dec. 202 (Ill. App. Ct. 1984); Lawyers Title Ins. Corp. v. Dearborn Title & Corp., 904 F. Supp. 818, 822 (N.D. Ill. 1995)*. For the same reasons stated in § III *supra*, the Association has standing to bring its claim under the Illinois Uniform Deceptive Trade Practices Act.

Counterclaim defendants also argue that summary judgment should be granted because their alleged false statements are true. To be actionable under the Illinois [*17] Uniform Deceptive Trade Practices Act, the alleged representation must be false, misleading or deceptive. *815 ILCS 510/2; Lynch Ford, Inc. v. Ford Motor Co., Inc., 957 F. Supp. 142, 147 (N.D. Ill. 1997)*. For the same reasons stated in § III *supra*, we find triable issues of fact as to whether the counterclaim defendants' statements are false. Therefore, counterclaim defendants' motion for summary judgment as to Count V is denied.

### CONCLUSION

For the foregoing reasons, counterclaim defendants' motion for summary judgment on Counts III, IV, and V is denied.

It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: February 4, 1998