

**Jaburg & Wilk, P.C.**
ATTORNEYS AT LAW

3200 N. Central Ave., Suite 2000
Phoenix, AZ 85012

Maria Crimi Speth, Esq.

mcs@jaburgwilk.com
Direct Line 602/248-1089
Main Fax 602/248-0522

October 24, 2006

<u>VIA FACSIMILE (312) 269-8869</u>
<u>AND FIRST CLASS MAIL</u>

Bart A. Lazar
Seyfarth Shaw Attorneys L.L.P.
55 East Monroe Street, Suite 4200
Chicago, IL 60603

    Re:    *George S. May v. Xcentric Ventures, LLC, et al.*

Dear Mr. Lazar:

    This letter is in response to yours dated October 20, 2006, which I received on Friday evening.

    We strongly disagree that the statement posted by my client in place of the removed postings violates the Court's order. A litigant's statement of its belief that a court order violates the constitution and federal statute is a classic example of speech protected by the First Amendment. The statement makes no "suggestion" that the material deleted was valid. Moreover, it does not mischaracterize the Court's order. I note that you have not attempted to explain how you think it mischaracterizes the Court's order. You also state that the postings repeat the headline of the posting that was removed. I have reviewed each posting that was removed and I did not see any instances of the headline still being there. Please tell me the report number of the report that you have in mind.

    Despite our strong disagreement with your position, my client desires to avoid further unnecessary filings in this case. Thus, without waiving any claim and without admitting that the previously posted statement violated the Court order, my client revised the statement over the weekend. The statement posted in place of the removed postings now reads, "This space previously contained a complaint about the business practices of George S. May. Rip-off Report has temporarily removed the posting pending Circuit Court review of a preliminary district court order that we believe violates the Federal Communications Decency Act."



EXHIBIT A

www.jaburgwilk.com
*Offices also in Scottsdale*
14500 N. Northsight Blvd., Suite 116 • Scottsdale, AZ 85260 • Tel 480/609-0011 • Fax 480/609-0016

10297-1/MCS/MCS/551111_v2

Dockets.Justia.com

Bart A. Lazar
October 24, 2006
Page 2

Please let me know if (1) you propose any further change to the statement; or (2) if there are any statements in which that change was **not** made.

Sincerely,

JABURG & WILK, P.C.

Maria Crimi Speth, Esq.

MCS:

cc: Client
    Jim Borcia

10297-1/MCS/MCS/551111_v2

## AFFIDAVIT OF KATIE TOPPEN

I, KATIE TOPPEN, hereby depose and say:

1. I am a resident of the State of Montana, am over the age of 18 years, and if called to testify in court in this matter I could and would truthfully testify to the following.

2. I have been informed that a lawsuit is currently pending in the United States District Court, Northern District, in Chicago, Illinois between Plaintiff GEORGE S. MAY INTERNATIONAL COMPANY ("GSM") and Defendant XCENTRIC VENTURES, L.L.C. ("Xcentric") (the "lawsuit"), among others.

3. I have been informed that GSM has claimed in the lawsuit that it lost certain business due to false information which appeared on website known as the "Rip-Off Report" which is located at www.ripoffreport.com.

4. In October 2005, I wrote a report and posted it on Rip-Off Report at the following address: http://ripoffreport.com/reports/ripoff162302.htm. The text of that report is as follows:

### George S May International Beware of this scam!
### Ripoff Las Vegas Nevada

In February of 2004 my husband and I were contacted by a representative of George S May. He wanted to come in and tell us what type of services George S May could offer our small business (we owned a small gift shop). We were quoted the price of $3000.00 for two George S May employees to fly in and consult with us. We were guaranteed a 2:1 reduction in expenses. After paying for the two men to fly in, their hotel, and their food, (which wasn't part of the $3000.00), we realized very quickly that we were lied to. These men spent 2 days with us giving us common sense advise, writing up a billing statement every couple of hours and having us cut them a check as they gave us the billing statement. I'm pretty sure they spent more time billing us than helping us. In the end it cost us over $10,000 dollars for them to come in and with a small business that does most of their business at Christmas time it was a HUGE loss. We never were able to recover from this scam and in September 2004 my husband couldn't handle it anymore and committed suicide. I lost a lot more than just money out of this scam. I lost my husband and partner and my children lost their daddy. Don't ever use this company, they will screw you over big time and you won't get a refund. They use bait and switch, smooth talking and scare tactics to get you to sign with them. I learned my lesson the hard way and hope no one would ever have to go through that. You're better off having a friend come in and give you advise.

Valorie
Pocatello, Idaho



10297-1/DSG/DSG/557119_v1

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

1  U.S.A.

2  5. Except for the signature, every word of this report is true. Although my true name is Katie, and although I live in Montana, I signed the report using the name "Valorie". This is my mother's name, and due to the nature of my husband's death, I used her name and location in order to maintain some level of privacy.

6. As indicated in my report, my husband Eric and I were owners of a small business located in Great Falls, Montana called MT Gifts, Inc. which did business under the name "Best of Montana". We borrowed the money and bought this business from my husband's parents who originally founded the company. Best of Montana had a small store and an online shop which offered gift baskets and similar items for sale.

7. In late 2003, we were approached by a salesman from the George S. May Company who wanted to know if we were interested in business consulting services. I do not remember the man's name, but I recall that he spoke with a heavy German accent. At the time we were in the middle of the holiday season which was the busiest time of the year for us, so we asked the man if he could come back after the holidays.

8. He returned in early 2004, and we agreed at that time to hire George S. May for $100 to perform a "survey" of our business to see if we could benefit from their services. After the survey was performed, we were told that we really needed to hire George S. May for additional consulting work right away, and we were told that we needed to have at least two people come in to help. We were told that this would cost no more than $3,000, and we were promised that if we spent that money, we would enjoy at least a 2:1 return on our investment from increased profits.

9. Based on what the George S. May salesman told us, my husband started to feel very scared that our business might fail if we did not hire them. Although our business was doing alright having just ended our busy holiday season, the $3,000 investment was a lot of money to us, but my husband was led to believe that we had to spend this money in order to get our business on the right track. So, we agreed and the

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

2

10297-1/DSG/DSG/557119_v1

1  next day or maybe two days later, George S. May sent two men into our business. We
2  had to pay the airfare to fly them in from another state.
3      10.    At the time, we were already using Quickbooks, and one of the men spent a
4  great deal of time on his laptop reading through our financial information. The other man
5  spent his time wandering through our store and making very basic, common sense
6  suggestions such as "You need to make better use of your window space," and things like
7  that.
8      11.    Every few hours, the men would generate some paperwork including a bill
9  for their time which had to be paid on the spot. It seemed to me that they spent as much
10 time billing us as they did working on other things. Ultimately, over the course of a
11 couple of days, they billed us more than $10,000, including meals and lodging.
12     12.    Eventually, they gave us a blue binder with some papers in it talking about
13 very simple and basic business ideas. None of the information was of any value to us. At
14 that time, we told them to leave, and they spent time on the phone making reservations for
15 their flight out. They not only billed us for the time they spent making their flight
16 arrangements, they also charged us for the airfare out of town.
17     13.    Over the next few months, our business began a sharp downhill decline.
18 None of the "advice" provided by George S. May helped. In fact, George S. May made
19 things worse for us because the money they charged us prevented us from being able to
20 pay our other bills, including taxes that we owed. Things just kept getting worse, and we
21 were not even able to make the payments to my husband's parents for the money we owed
22 them from buying the business.
23     14.    In September 2004, about nine months after the experience with George S.
24 May, my husband took his own life, leaving me a widow with our two sons who were
25 ages 8 and 3 at the time.
26     15.    In all the time we were married, I only saw my husband get really anxious
27 and scared on two occasions—once when he received the news from George S. May
28 regarding how badly our business was doing, and the second time in the few days prior to

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

3

10297-1/DSG/DSG/557119_v1

his death. In my view, my husband simply could not cope with the failure of our business, and George S. May bears a significant amount of responsibility for that failure.

16. Since my husband's death, I sold Best of Montana and have tried to move on with my life. My older son is currently in counseling for children who have lost a parent, and he is doing better now.

17. Due to my experience with the George S. May Company, I wrote the report on Rip-Off Report in order to warn others so that hopefully no one will have to go through what I did. I also filed a complaint against George S. May with the Federal Trade Commission via their website, but other than a confirmation email, I never heard anything back from either the FTC or George S. May.

**WITNESSETH** I have read the foregoing Affidavit and I declare under penalty of perjury that the facts stated therein are true and correct as of the date this Affidavit was sworn.

DATED: November 16, 2006

Katie Toppen (Vaughan)
Tel. (406) 452-5348
kaidmom@msn.com

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

4

10297-1/DSG/DSG/557119_v1



## AFFIDAVIT OF RUTH SMITH

I, RUTH SMITH, hereby deposes and says:

1. I am a resident of the State of Michigan, am over the age of 18 years, and if called to testify in court in this matter I could and would truthfully testify to the following facts based upon my own personal knowledge.

2. I have been informed that a lawsuit is currently pending in the United States District Court, Northern District, in Chicago, Illinois between Plaintiff GEORGE S. MAY INTERNATIONAL COMPANY ("GSM") and Defendant XCENTRIC VENTURES, L.L.C. ("Xcentric") (the "lawsuit"), among others.

3. I have been informed that GSM has claimed in the lawsuit that it lost certain business due to false information which appeared on website known as the "Rip-Off Report" which is located at www.ripoffreport.com and www.badbusinessbureau.com (the "ROR Site").

4. I have been informed that GSM claims that my grandson's business is one of the customers that it lost solely or primarily due to false information which appeared on the ROR Site. This statement is not true.

5. I am an 80 year old grandmother. My grandson Tim Strickland and his wife Stephanie are the co-owners of a business called Lansing Lawn & Snow, Inc. which is located in Mason, Michigan. I loaned Tim and Stephanie the money to buy this business, and I have been involved in the operation of the business as well since they bought it.

6. In early December 2005, we were approached by a salesman from the George S. May Company who offered to perform consulting services for us. At the time, our business was doing quite a bit of work, but we were having problems getting paid for jobs that we had done, and that made it very hard for us to pay our own bills. We simply did not seem to have enough money to run the business and we felt we needed help.

7. We told this to the George S. May salesman, and he said that the reason our company was having trouble was that we were not properly managing it. He told us that if we hired George S. May, they would show us how to properly run and manage the
Jaburg & Wilk, Attorneys at Law, 3200 North Central Avenue, Suite 2000, Phoenix, Arizona 85012

10297-1/DSG/DSG/553475_v1

business, and that once we learned these things, we would be much better off. He even said things like, "if you hire us you will have so much money you won't even know what to do with it all," and things like that. That sounded really great to us.

8. The sales pitch we received was very "slick" and polished, but also very high pressure. At one point, I remember the salesman saying that if we just paid George S. May $40,000, they would really be able to help us. I knew right away that was much more than we could possibly afford, and I told him so. He then came back and told me that he was able to pull some strings and lower his price to $20,000, but they would have to do a little less work for that small a fee. He made it seem like he was doing us a favor.

9. I was really unsure about what I was hearing, so we went on the internet and did some research. One of the websites we saw was www.RipoffReport.com, and there were a lot of bad complaints about George S. May posted there.

10. I talked to the salesman about what I had seen on Ripoff Report, and he was already familiar with these complaints. The salesman told me that the reports were all "made up", "false" and "a bunch of lies". He told me that I should not believe these lies, and I told him that I would believe him.

11. Even though we saw complaints on Ripoff Report, we eventually agreed to hire George S. May, and they sent several men into our business for about three days. We told them that the business was really struggling for money, and they promised us that we could "stop at any time". Eventually, I wrote a check to them from my savings account for about $9,000 or $10,000, and my granddaughter also paid them another $10,000 using my credit card to borrow the money (maybe with a cash advance or something; I don't exactly remember). All told, we paid them about $20,000 as we had promised.

12. After they got the money, the men left and we never heard anything from them again. They did nothing at all to help our business, and they delivered nothing on any of the promises they made to us. Along the way, they did make some suggestions on what we could do, but we simply did not have the money to implement these suggestions so we were never able to use them. That was very disappointing because the salesman

2

10297-1/DSG/DSG/553475_v1

knew how limited our resources were from the beginning and I was clear when I told him that if he could not help us for $20,000, then I did not want his services at all.

13. Since our encounter with the George S. May Company, I have had to struggle to try to pay the credit card that was used to pay them. This has been very hard for me, and our business is still doing badly. I wish that we had never heard of the George S. May Company. Other people should be warned to stay away from them.

14. I have been informed that George S. May is suing Ripoff Report for publishing complaints which accused it of being a "scam", a "fraud", and things like that. I have been told that George S. May claims these statements are false. That is completely outrageous to me because it is true. George S. May may not rip off every customer, but that's certainly what they did to us. I wish that I had believed what I read on Ripoff Report instead of believing the lies told to me by the George S. May Company.

15. I have also been told that George S. May has listed Lansing Lawn & Snow on a list of customers that it claims it lost because of false information on Ripoff Report, and it is asking the Court to award it damages for the profits it lost. That is even more outrageous and is a complete lie. They did not lose our business—they got it—and they took $20,000 from an 80 year old grandmother and gave us nothing in return.

16. I have been told that there is a hearing scheduled in this case for this coming December 2006. I live four hours away from Chicago and it would be hard for me to drive that far in the middle of winter, but I would very much like to testify by telephone so that the judge can hear the truth about what this company did to me and my grandchildren. WITNESSETH I have read the foregoing Affidavit and I declare under penalty of perjury that the facts stated therein are true and correct as of the date this Affidavit was sworn.

DATED: 10-31-06

*Ruth Smith* (signature)
Ruth Smith
5276 West Columbia Road
Mason, MI 48858
Tel: (517) 676-5780
Fax: (517) 676-8805
Tel: (813)-788-6345

3

10297-1/DSG/DSG/553475_v1